2010 VT 70

## State of Vermont v. Howe Cleaners, Inc., David Benvenuti, Jason's Dry Cleaning, Inc., Granite Savings Bank & Trust Company, The Howard Bank, N.A., T.D. Banknorth, N.A., and John Fiore, Trustee, 9 Depot Square Realty Trust

[9 A.3d 276]

No. 09-110

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed August 6, 2010

*William H. Sorrell*, Attorney General, and *Mark J. Di Stefano* and *John D. Beling*, Assistant Attorneys General, Montpelier, for Plaintiff-Appellant.

*R. Bradford Fawley*, *Matthew S. Borick*, and *Elizabeth R. Wohl* of *Downs Rachlin Martin PLLC*, Brattleboro, for Defendant-Appellee T.D. Banknorth, N.A.

*Robert Reis* and *Matthew D. Anderson* of *Reis, Urso, Ewald & Anderson, PLLC*, Rutland, for Defendant-Appellee Fiore.

¶ 1. **Burgess, J.** In this civil enforcement action concerning the State's attempt to hold prior and past owners liable for its costs of responding to and cleaning up a hazardous waste contamination site, the State appeals from the dismissal of its claims against appellees T.D. Banknorth, N.A. (Banknorth), and John Fiore. We affirm.

¶ 2. In 2000, the Agency of Natural Resources (ANR) determined that the property located at 9 Depot Square in the City of Barre was the source of extensive perchloroethylene contamination of the soil and groundwater in the area. A dry-cleaning business, Howe Cleaners, Inc., had operated on the site for over two decades before a bakery business started up in 1997. When the bakery failed a year or so later, Banknorth (through a predecessor-in-interest) foreclosed on and took title to the property. Several months later, in March 1999, Fiore purchased the property and operated a pizzeria on the premises until a fire destroyed the building in 2008. Since 2000, the State has incurred, and is continuing to incur, substantial response costs for studying and monitoring the site.

¶ 3. In January 2004, the State brought an action in the superior court pursuant to 10 V.S.A. § 6615 of Vermont's Waste Management Act (VWMA) and the common law of public nuisance against the current owner, Fiore, and various past owners and operators of the site, including Banknorth and Howe Cleaners. The State sought to hold defendants liable for its past, present, and future response costs and also sought civil penalties against Howe Cleaners and Banknorth based on the release of hazardous material into the environment during the time that they owned the premises. Defendants generally denied liability and filed cross-claims or third-party claims or sought indemnity from other defendants.

¶ 4. In June 2005, Banknorth and Fiore moved for summary judgment. The State opposed the motions and cross-moved for summary judgment. In March 2006, the trial court issued a ruling on the motions. In denying Fiore's motion, the court ruled that Fiore, as owner of the property, could be held liable even absent proof of any release or threat of release while he owned the property. The court further held that it had no clear factual record on which to decide whether Fiore was entitled to judgment as a matter of law on his defense that, as a "diligent owner" who investigated the site before buying it, he was not liable under the

statute. Regarding Banknorth's motion, the court ruled that the State had presented sufficient evidence "in the posture of the motion under consideration to establish a triable issue" as to whether there was a release or threat of release during Banknorth's ownership, but that the State had failed to come forward with any facts demonstrating a triable issue on whether Banknorth had created a public nuisance. Accordingly, the court denied summary judgment to Banknorth as to the State's statutory claim, but granted its motion as to the public nuisance claim. The court also denied the State's cross-motion with respect to Howe Cleaners and Banknorth. Finally, although the court ruled that Fiore could be liable as owner of the contaminated site, it reiterated that he was entitled to present his diligent-owner defense at trial.

¶ 5. Two months later, in June 2006, the trial court ruled on Banknorth's pending motion to compel the attendance of the State's designee(s) at a deposition noticed pursuant to V.R.C.P. 30(b)(6). Rule 30(b)(6) allows a party to name an organization, including a governmental agency, as the deponent and requires the named organization to designate one or more persons to testify on its behalf. Banknorth's notice included a request for the State to produce nine categories of documents and evidence underlying or relating to the claims of contaminants released at the property during and prior to Banknorth's ownership. In response, the State moved for a protective order, arguing that the Rule 30(b)(6) deposition improperly sought attorney work-product and was premature, overbroad, and not sufficiently particular. For the most part, the court rejected each of these arguments in granting Banknorth's motion to compel the discovery and denying the State's request for protection except for one category of information relating to the federal government's role at the site. Banknorth decided not to proceed with the deposition at that time, however, while the parties engaged in court-ordered mediation over the summer of 2006.

¶ 6. On October 10, 2006, following an unsuccessful mediation, Banknorth and Fiore filed motions to compel further discovery and issued a joint Rule 30(b)(6) "re-notice" of deposition scheduled for November 1, 2006. This re-notice listed the same evidence to be produced as in the first deposition notice, including the one category previously quashed by the court, plus two new requests to disclose evidence of Fiore's knowledge of contaminant release

and lack of care. The State opposed the discovery and, five days before the scheduled deposition, again filed a motion for a protective order on many of the same grounds as before. The State notified Banknorth and Fiore that it would not appear for the deposition pending a ruling on its renewed motions. With no ruling from the court, the State did not appear at the deposition. Nevertheless, Banknorth and Fiore did attend the deposition as scheduled, and then filed motions for sanctions based on the State's failure to appear.

¶ 7. In April 2007, the trial court, with a new judge presiding on rotation, granted Fiore's renewed motion for summary judgment, concluding that Fiore's reasonable reliance on his physical inspection of the subject property and on a professional environmental assessment produced for his review by Banknorth before its sale of the contaminated property to him was, as a matter of law, a diligent and appropriate investigation that satisfied the statutory diligent-owner defense to liability under the VWMA. The court also concluded that the State failed to make an adequate showing of a public nuisance that was actionable outside the scope of the Act.

¶ 8. Soon afterwards, in May 2007, and in response to Banknorth's motion for sanctions, the trial court precluded the State "from using at trial evidence that should have been provided in accordance with" the court's first order, in June 2006, compelling the State's compliance with discovery and its attendance at deposition. Following that ruling, Banknorth filed a second motion for summary judgment, arguing that the State could not prevail in light of the evidence limitations imposed by the sanctions order. The State opposed Banknorth's motion and cross-moved for summary judgment.

¶ 9. In February 2008, the trial court granted summary judgment to Banknorth. Declining the State's invitation to set aside the sanction in light of more recent discovery production, the court reviewed the history of the discovery dispute and reiterated that the serious sanction imposed on the State was justified. Most significantly, the court concluded that without the evidence· of contaminant release precluded by the sanctions order, the State could not meet its burden of proof on its claims against Banknorth.

¶ 10. In July 2008, the State entered into a consent decree with Howe Cleaners. Further negotiations proceeded between the

remaining parties. The trial court dismissed the State's claims against Banknorth and Fiore in February 2009 after those and other defendants settled cross-claims and third-party claims among themselves.

¶ 11. The State appeals, arguing that the trial court erred in granting summary judgment to Banknorth based on a litigation-ending discovery sanction against the State by not considering a lesser penalty, by disregarding its earlier acknowledgement of evidence produced by the State, and by failing to specify the perimeters of its preclusion order. Regarding summary judgment in favor of Fiore, the State asserts that the court erred in accepting as adequate Fiore's reliance upon a site-assessment report that the State contends was insufficient as a matter of law to satisfy the statutory defense of diligent investigation. The court erred further, the State maintains, by not allowing the State to seek additional discovery as to whether Fiore knew or should have known about the contamination regardless of the assessment report, and by ruling that its public nuisance claim was effectively preempted by the VWMA.

## I.

¶ 12. We first address the State's claims of error with respect to the trial court's grant of summary judgment in favor of Banknorth. The State's primary argument is that, given the facts and circumstances of this case, the court lacked a sufficient basis to impose what amounted to a litigation-ending sanction under Rule 37(b)(2) of the Vermont Rules of Civil Procedure. For the reasons discussed below, we disagree.

¶ 13. Before examining Rule 37 and the State's specific arguments, we recount in detail the parties' positions on Banknorth's liability and the trial court's reasoning for initially denying, and then later granting, summary judgment to Banknorth. In the March 2006 order, Judge Toor denied both Banknorth's and the State's motions for summary judgment. The critical dispute that the court resolved in that order concerned the scope of Banknorth's liability under 10 V.S.A. § 6615(a)(2), a provision of the VWMA that extends liability to "any person who at the time of release or threatened release of any hazardous material owned or operated any facility at which such hazardous materials were disposed of." The court rejected what it described as the State's expansive view that the mere fact of continuing contamination

from an event preceding a particular person's ownership of the subject property is a "release" and thus makes that person liable under § 6615(a)(2). Instead, the court accepted Banknorth's position that, for the State to prove liability under § 6615(a)(2), it would have to demonstrate that a release or threat of release — such as a spill or threat of a spill — actually occurred or existed during the brief period when Banknorth owned the property.

¶ 14. Having determined the scope of Banknorth's liability, the trial court then moved on to the question of whether either Banknorth or the State was entitled to summary judgment. In describing the state of the evidence and ruling on the parties' competing motions for summary judgment, the court made what appear to be conflicting statements. Specifically referring to Banknorth's motion for summary judgment, the court noted that because the State had taken the position that the timing of the release was irrelevant, it had made only "an evidentiary showing that there is a triable issue about whether a release or threat of release occurred *or was ongoing* during Banknorth's ownership." (Emphasis added.) Yet, the court also found that "the State has cited to substantial evidence in support of a release or threat of release during the period of Banknorth's ownership," including evidence supporting the State's contention that (1) underground storage tanks "may have" been abandoned or not maintained during that time; (2) vapors from hazardous wastes were being emitted into the air; and (3) a sump pump that was prone to collecting hazardous wastes may have been cleaned out. At the same time, however, the court stated that "[i]n analyzing whether the State has demonstrated that there is a triable issue with regard to 'release,' the court . . . bears in mind that this matter has been raised only in the most general sense." In the end, the court denied Banknorth's motion for summary judgment because Banknorth had indicated "an absence of evidence only in a very general way," and the State had established a triable issue given "the posture of the motion under consideration."

¶ 15. Moreover, the court stated, in denying the State's motion for summary judgment as to its claims against Banknorth, that in light of its decision on the scope of Banknorth's liability under § 6615(a)(2), "[t]he remaining controversy between the parties is the timing of any releases or threats of releases." The court reiterated that, thus far, the State had merely alleged that releases or threats of release — which it viewed as including the

mere continuation of contamination — took place during the time each defendant owned or operated the facility. According to the court, with respect to the brief period of Banknorth's ownership, the State "fail[ed] to articulate any specific evidence of 'spilling, leaking, pumping, pouring, emitting, emptying, dumping, or disposing' necessary to a release or threat of release, or any evidence as to the timing thereof."[1] Rather, the court found that the State had "merely cite[d] to a long list of exhibits without separately listing or explaining what facts they arguably prove." The court further stated that many of the cited exhibits contained "highly technical scientific information likely requiring expert interpretation."

¶ 16. In the February 2008 order granting summary judgment to Banknorth, Judge Teachout discussed the March 2006 order in which Judge Toor had denied summary judgment, noting that the State's evidence "was of a general nature and not sufficiently specific to support judgment as a matter of law in its favor." The court stated that although Judge Toor had denied summary judgment to both parties, her ruling on the scope of liability under § 6615(a)(2) not only rejected the theory under which the State had made its proffer of evidence but also focused the controversy on the timing of any alleged releases with regard to Banknorth's ownership. With this ruling in play, it became incumbent upon the State to focus its evidence on the timing of any claimed release or threat of release. As Judge Teachout stated, "following [Judge Toor's] ruling, the strength of the State's case against TD Banknorth depended on the specific evidence the State had to support its claim that there had been a 'release or threat of release' during the period of TD Banknorth's ownership under the interpretation set forth by Judge Toor." Banknorth subsequently pursued discovery precisely on this issue, which, the court

---

[1] Indeed, at the time of the March 2006 ruling, the court seemed to view these first cross-motions for summary judgment as amounting to little more than a preliminary factual skirmish lacking particularized proof, noting that "[i]n its statement of material facts, the State makes little more than the conclusory allegation that there have been ongoing releases and threats of releases of hazardous wastes throughout all defendants' ownership of the property, failing to explain what they may be, or when they may have occurred." The court added that while it was undisputed that the property was contaminated with hazardous waste at the present time, neither party had "organized the record sufficiently for purposes of Rule 56 [summary judgment] to allow the court to reliably determine what other material facts are genuinely disputed."

observed, was unduly resisted by the State, thereby opening the door for Banknorth's renewed motion for summary judgment.

¶ 17. With this background in mind, we now examine Rule 37 and the State's claims of error with respect to the trial court's grant of summary judgment in favor of Banknorth. In relevant part, Rule 37(b)(2) states that if a party fails to obey a court order to provide or permit discovery, "the court in which the action is pending may make such orders in regard to the failure as are just." These may include presuming that certain facts have been established, "refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence," or even dismissing an action. V.R.C.P. 37(b)(2)(B)-(C). Imposition of sanctions under this rule "is necessarily a matter of judicial discretion" that is "not subject to appellate review unless it is clearly shown that such discretion has been abused or withheld." *John v. Med. Ctr. Hosp. of Vt., Inc.*, 136 Vt. 517, 519, 394 A.2d 1134, 1135 (1978); accord *State v. Lee*, 2007 VT 7, ¶ 15, 181 Vt. 605, 924 A.2d 81 (mem.) ("As with other discovery rulings, the decision to impose sanctions for failure to comply with an order compelling discovery lies well within the trial court's discretion." (quotation omitted)).

¶ 18. Notwithstanding this broad discretion, however, we have held "that where the ultimate sanction of dismissal is invoked it is necessary that the trial court indicate by findings of fact that there has been bad faith or deliberate and willful disregard for the court's orders, and further, that the party seeking the sanction has been prejudiced thereby." *John*, 136 Vt. at 519, 394 A.2d at 1135; accord *Rathe Salvage, Inc. v. R. Brown & Sons, Inc.*, 2008 VT 99, ¶ 12, 184 Vt. 355, 965 A.2d 460 ("Despite trial courts' otherwise broad discretion to impose discovery sanctions . . . , litigation-ending sanctions are reserved for only the most flagrant cases and are inappropriate where failure to produce discovery is due to an inability fostered by circumstances outside of the party's control."). Accordingly, we have reversed trial court orders dismissing cases or entering default judgments as discovery sanctions when the orders did not set forth findings indicating the existence of bad faith on the part of the recalcitrant party and prejudice to the other side. See *John*, 136 Vt. at 519, 394 A.2d at 1135 (reversing dismissal order as discovery sanction

where trial court's lack of findings regarding bad faith and prejudice left this Court unable to perform its function of reviewing trial court's exercise of discretion); see also *In re Houston*, 2006 VT 59, ¶¶ 13-16, 180 Vt. 535, 904 A.2d 1174 (mem.) (reversing dismissal order as discovery sanction because order was not supported by findings demonstrating bad faith and prejudice); *Manosh v. First Mountain Vt., L.P.*, 2004 VT 122, ¶¶ 1, 10, 177 Vt. 616, 869 A.2d 79 (mem.) (reversing default judgment as discovery sanction because order was not supported by findings indicating willfulness or prejudice, and it was impossible for this Court to ascertain basis for sanction). We have stated that "[t]he purpose of the findings required by *John* is to protect against arbitrary dismissals that may violate principles of due process." *Houston*, 2006 VT 59, ¶ 17.

¶ 19. The State relies on these cases generally disapproving the "ultimate sanction" of summary default or dismissal in response to a party's failure to abide by its discovery obligations, arguing that the trial court abused its discretion by imposing a litigation-ending sanction without making the requisite findings of bad faith and prejudice. We find the State's reliance on these cases unavailing. However similar in its effect, no ultimate sanction was actually imposed here. Although the sanction order led to the adverse judgment against the State, there was no outright dismissal or default. That the State could not proceed was due at least in part to its earlier tactical decision to present only the most general proffer of evidence sufficient to defeat Banknorth's original motion for summary judgment designed to flush out the State's evidence. As discussed above and explained by the trial court, the State then argued for the broadest application of release liability supported by only general evidence barely sufficient to establish an outstanding factual dispute, but failed to proffer specific evidence to confront and prevail against Banknorth's narrower theory of its potential liability based on the timing of the release. Had the State adopted a different strategy, more specific evidence produced in the earlier proceeding may have been exempt from the later sanction and possibly sufficient to survive the post-sanction motion for summary judgment.

¶ 20. Hence, the State's premise — that the court's sanction order was an unfounded ultimate sanction not favored in our case law — is faulty, and the cases cited in support of the State's proposition are inapposite. Rather than sanction the State by

dismissing or defaulting its case, the court tailored the sanction to fit the violation by precluding the State "from using at trial evidence that should have been provided in accordance with" the June 2006 order requiring the State's representative(s) to be available for Banknorth's noticed deposition. By its terms, the court's order was the neutralizing evidentiary remedy contemplated by Rule 37(b)(2)(B) (authorizing trial court to prohibit disobedient party "from introducing designated matters in evidence") — not a dismissal under Rule 37(b)(2)(C) (authorizing trial court to dismiss action).

¶ 21. This case is similar to *Lee*, where the trial court sanctioned the offending party for discovery violations by accepting facts and allegations in the complaint as established and precluding the offending party from presenting a defense. 2007 VT 7, ¶ 6. As here, the trial court later granted summary judgment to the other side, and the sanctioned party argued to this Court that "the superior court was required to make findings [of bad faith and prejudice] on the record prior to imposing such sanctions." *Id.* ¶ 17. We acknowledged that such findings are necessary when the "trial court imposes the ultimate sanction of dismissal," but concluded that "dismissal was not ordered" and that the offending party had been "allowed additional opportunities to argue against the relief sought by the [opposing party] in response to its motions for summary judgment." *Id.*; accord *Von Brimer v. Whirlpool Corp.*, 536 F.2d 838, 843-44 (9th Cir. 1976) (rejecting appellants' argument that trial court's order excluding exhibits was dispositive of case and thus amounted to extreme sanction of dismissal under 37(b)(2)(C) requiring showing of bad faith, and instead concluding that evidence was excluded under 37(b)(2)(B)). But cf. *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 602-03 (9th Cir. 1988) (concluding that sanction declaring all allegations in complaint as established and precluding any defense to claim was equivalent to dismissal or default judgment).

¶ 22. Here, as noted, but for the State's earlier decision to pursue a broadly general — rather than more specific time-of-release-based — theory of liability, there may still have been, as in *Lee*, an opportunity to present evidence not improperly withheld and to argue its sufficiency to overcome Banknorth's motion for summary judgment. The State correctly notes that the sanction in *Lee*, in contrast to the instant case, was not particularly

prejudicial because the essential facts established against the violator were incontrovertible in any event. *Lee*, 2007 VT 7, ¶ 17. The strength of the nonoffending party's case in *Lee*, however, was entirely coincident to, and not the point of, the holding relied upon here. Although the sanction ordered in *Lee* fixed facts against the discovery violator that practically sealed a litigation victory for the other side, that result neither influenced nor diminished our holding that the order was not a litigation-ending "ultimate sanction" of dismissal requiring special findings of bad faith and prejudice. See *id.* In short, no special findings of bad faith or prejudice, or exhaustion of lesser sanctions, are required for anything less than the ultimate sanctions of dismissal or default, *id.*, and thus the State's claim of error in this case based on the trial court's omission of such findings is unavailing.

¶ 23. The State makes several other related arguments. For example, the State contends that the trial court could not describe the State's conduct as constituting bad faith or willful disregard of a previous court order because (1) the State's renewed motion for a protective order was appropriate in light of Banknorth's expanded Rule 30(b)(6) notice of deposition; (2) the State made a good-faith request that the deposition notice be held in abeyance in light of Banknorth's pending motions to compel further discovery and to grant summary judgment; and (3) the court inappropriately considered previous discovery delays allegedly caused by the State but not subject to a prior order. Moreover, the State contends that the court's prejudice analysis was flawed because the court considered earlier discovery delays not subject to a prior order, failed to consider that discovery was not yet closed in the case, and failed to consider a lesser sanction. In the State's view, the court should have imposed a less drastic sanction because, following the court's preclusion order, the State complied with the court's order by submitting supplemental discovery responses and allowing a deposition of its expert.

¶ 24. As explained above, the sanction order required no special findings of bad faith, prejudice, or lack of enforcement alternatives. Nevertheless, the trial court hardly imposed or enforced its sanction in a vacuum. In its order granting summary judgment, the court categorized the State's election not to appear for the compelled deposition as egregious because it ignored a specific court order and deprived Banknorth of discovery that the court ruled the bank had been entitled to for a considerable period of

time, thereby causing significant delay in the progress of the case and unnecessary expense to the other litigants. The court's refusal to overlook the State's egregious noncompliance simply because the State cooperated after the sanction was invoked is an entirely supportable act of discretion.

¶ 25. In its summary judgment order, the trial court recounted a history in which the State resisted Banknorth's efforts to unveil the precise factual basis for the State's lawsuit against it. Since the court's earlier March 2006 order denying summary judgment narrowed the focus of the case to liability turning on the timing of contaminant releases, Banknorth sought to discover the State's evidence on that point, but to no avail. As the court stated, its previous June 2006 order denying the State a protective order made it "clear that the State would not be permitted to obviate TD Banknorth's discovery rights and simply refuse to disclose the factual basis for its claims." As for the State's renewed motion for a protective order — which preceded the scheduled deposition by only a few days — the court found the motion allowed insufficient time for Banknorth or the court to respond, and that the motion's new objections could have been raised and addressed individually at the noticed deposition without the need to thwart the scheduled and otherwise court-approved proceeding.[2]

¶ 26. The State further argues that even if the sanction was not error, the superior court nevertheless abused its discretion when it disregarded its prior summary judgment decision both by failing to give effect to the limitation in its sanctions order precluding only that evidence that "should have been provided," and by excluding the affidavit of the State's expert witness. Noting that the court's earlier order denying summary judgment explicitly stated that the State presented evidence supporting its assertion of releases during Banknorth's ownership of the property, the State argues that Banknorth should have been required to delineate what evidence presented in the State's later opposi-

---

[2] The State makes too much of the fact that Banknorth's "re-notice" of the deposition requested some additional information, sought one category of information disallowed by the court's previous order, and was joined by Fiore. The State posits that the second notice was sufficiently distinct so as to justify its renewed motion for a protective order and its decision not to appear for the deposition unless compelled anew by the court. As a practical, rather than tactical, matter, however, most of the re-notice did not differ in any material way from the first notice previously ruled on and endorsed by the court.

tion and cross-motion to Banknorth's second summary judgment motion was "new" evidence that "should have been provided" at the Rule 30(b)(6) noticed deposition. In short, the State argues that the court never gave effect to the "should have been provided" language in its sanctions order.

¶ 27. We disagree. As noted, while it is true that the court's denial of Banknorth's earlier motion for summary judgment recited that the State had satisfied its burden of establishing a triable issue, that same order more particularly described the state of the record as only generally including evidence supporting the State's contentions that releases or threats of releases may have occurred during Banknorth's ownership of the subject property. In an apparently generous characterization, keeping in mind that its ruling on the scope of liability under § 6615(a)(2) had focused the controversy on the timing of any releases or threats of releases, the court described the State's evidence in the earlier motion as "sufficient in the posture of the motion under consideration to establish a triable issue."

¶ 28. The trial court's initial reliance on exhibits generally referencing potential bases for releases during Banknorth's ownership does not demonstrate, as the State suggests, that the court later erred either by failing to parse the State's evidence or by granting Banknorth summary judgment based on its conclusion that the State could no longer prove its case in light of the sanctions order. At minimum, more discovery was needed to explore potential sources of releases generally referenced in the State's exhibits, and most particularly the timing of any releases with respect to Banknorth's ownership of the property. The fact that the State may have had some evidence as to what releases may have occurred during Banknorth's brief ownership of the property did not preclude the court from later granting Banknorth summary judgment based on its preclusion order imposed after the State resisted Banknorth's efforts to learn the bases for these alleged releases.

¶ 29. More to the point, it was for the State, not the court or Banknorth, to give effect to and take advantage of the limits of the sanction. The State correctly recognizes the import of the court's order precluding only such evidence that was ordered to be disclosed and thus that "should have been provided" at the time of the deposition. But, as the party solely responsible for its

evidence, only the State knew for certain what evidence it had in hand that was not covered by the June 2006 compulsion order and subject to the May 2007 sanction. To avoid summary judgment, therefore, it was properly the State's burden to identify, with supporting affidavits, the specific evidence upon which it continued to base its case that was not precluded by the sanctions order. The State, however, failed to disclose or distinguish the full extent of the evidence in its possession at the time of the deposition. In short, the State failed to meet its burden of demonstrating precisely what evidence was not covered by the sanctions order and how that evidence was sufficient to defeat Banknorth's motion for summary judgment.

¶ 30. The State's final argument on this point is that the trial court erred by relying on its sanctions ruling to preclude the State from offering the opinion of its expert. According to the State, the court ruled it was obligated to disclose the expert at the Rule 30(b)(6) deposition because the expert had submitted an affidavit in support of the State's earlier motion for summary judgment and thus was its designated representative. The State contends, however, that the expert was not its designee for purposes of testifying at the deposition, but rather an independent environmental consultant whom the State hired to undertake response actions at the site and whom the State later timely disclosed as an expert witness following the close of discovery. In the State's view, it was error to exclude the expert's affidavit because he was not the designated State representative for purposes of the Rule 30(b)(6) deposition, and further because the State submitted the expert's affidavit in compliance with the court-ordered schedule for disclosure of experts. The State asserts that Banknorth cannot use a Rule 30(b)(6) deposition notice to force the State to disclose all expert testimony that it might offer against the bank.

¶ 31. Again, the State's argument is unavailing. The critical inquiry is whether the evidence presented in the expert's affidavit could have been identified and disclosed by the State's representative, whoever that would have been, at the deposition noticed for November 1, 2006. The deadline for disclosure of experts did not obviate compliance with a parallel court order arrived at by separate motion practice compelling the State to disclose certain described evidence at an earlier date. The State fails to demonstrate that its expert's affidavit contained new information outside

the purview of the sanctions order and, if so, that its content was sufficient to avoid summary judgment. Accordingly, we find no error in the trial court granting summary judgment to Banknorth.

## II.

¶ 32. We now turn our attention to the State's claims of error with respect to the trial court granting summary judgment in favor of Fiore. The State first argues that the court erred in granting summary judgment to Fiore based on what the court referred to as the "diligent owner" defense. The statute provides that a person who owns or operates a facility at the time of a release or threatened release "shall be liable unless he or she can establish by a preponderance of the evidence that after making *diligent and appropriate investigation* of the facility, he or she had *no knowledge or reason to know* that said release or threatened release was located on the facility." 10 V.S.A. § 6615(e) (emphasis added). In the State's view, Fiore's alleged good-faith lack of knowledge of any contamination on the subject property is based primarily on his reliance upon an environmental assessment that did not meet professional standards and thus cannot support his statutory diligent-owner defense.

¶ 33. The trial court took a different view. Interpreting this defense as having both objective and subjective components, the court applied an objective reasonable person standard as to whether the investigation was "diligent and appropriate," and both objective and subjective standards as to whether the owner had knowledge or reason to know of the release or threatened release. The court found that Fiore never had any knowledge of any contamination on the property before buying it. According to the court, then, the questions were whether Fiore's investigation was diligent and appropriate under the circumstances, and whether, following the investigation, a reasonable person should have known of the contamination.

¶ 34. The court found that Fiore's investigation consisted of his visual inspection of the property and his review of a recent Phase I environmental site assessment of the subject property commissioned by Banknorth after it foreclosed on the property. This assessment was conducted by an engineering company, Griffin International, Inc. The detailed fourteen-page Griffin report included various attachments and described, among other things, (1) the property's site features, geologic/hydrogeologic conditions, and

historical use; (2) the company's site reconnaissance of the property; (3) its search of an environmental database to determine what other nearby uses might indicate contamination of the property; and (4) its interviews with state agency personnel and persons with knowledge of the subject property. The report indicated that it had been completed in accordance with standard practices for a Phase I environmental site assessment, and concluded that, other than the need to remove construction debris, "[n]o other significant environmentally hazardous conditions were identified on the subject property," and that "no further investigative work is recommended at this time, based on currently available data."

¶ 35. The court determined that it was objectively reasonable for Fiore "to rely on a recently produced, professional Phase I environmental report, such as the Griffin report in this case, and that such reliance is sufficient to constitute diligent and appropriate investigation as a matter of law." According to the court, it was objectively reasonable for Fiore to rely upon the Griffin report because neither party suggested the existence of any facts that should have put Fiore on notice of either existing contamination or a faulty environmental assessment. The court noted that the State failed to identify "any circumstances that would have given an ordinary person such as Fiore any reason whatsoever to doubt the findings and conclusions in the Griffin report, or any reason to question whether it conformed to professional standards or was negligently undertaken." Given these circumstances, the court concluded that Fiore was not required to "look behind" the Griffin assessment.

¶ 36. The State's principal argument in challenging the trial court's decision is that merely being shown a report does not constitute an investigation. According to the State, the Griffin investigation failed to comply with performance standards and thus could not be "diligent and appropriate" under the plain meaning of § 6615(e). The State asserts that Fiore's recourse for the faulty investigation is to pursue claims against Griffin, but that Fiore cannot escape liability under the VWMA by relying on a negligently conducted environmental assessment. In making this argument, the State relies upon an analogous federal law, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), which requires landowners seeking the defense to demonstrate that they carried out all appropriate

inquiries "into the previous ownership and uses of the facility in accordance with generally accepted good commercial and customary standards and practices," 42 U.S.C. § 9601(35)(B)(i)(I), as well as federal regulatory criteria for determining whether an innocent-landowner defense has been met under that statute. Finally, the State argues that public policy militates against allowing landowners to rely on negligently conducted Phase I environmental site assessments. According to the State, Fiore should be liable under the circumstances because the public has a strong interest in promoting (1) a system of strict liability for hazardous waste sites; (2) accountability of environmental professionals called upon to perform Phase I investigations; and (3) responsibility on the part of purchasers of properties with a history of commercial use.

¶ 37. We uphold the trial court's grant of summary judgment in favor of Fiore, but we emphasize that our decision is based on all of the circumstances of this case and not just Fiore's reliance upon the Griffin assessment. While the trial court focused primarily on the Griffin assessment, it also noted Fiore's visual inspection of the property and other facts, as well as the absence of any evidence indicating that the assessment was faulty. To the extent that the trial court's decision suggests that reliance upon a seemingly valid Phase I environmental site assessment always satisfies the diligent-owner defense, we need not reach that question. Rather, as detailed below, we examine all of the circumstances of this case in affirming the trial court's grant of summary judgment in favor of Fiore.

¶ 38. In any event, we reject the State's argument that reliance on a negligently performed environmental assessment cannot ever be, as a matter of law, a factor in determining whether the diligent-owner defense is satisfied. That a professionally prepared and apparently legitimate assessment turns out to be flawed casts no shadow on its objective dependability, or on the actual and objective lack of suspicion of the user, at the time the assessment was relied upon. As the trial court found, nothing in the record suggests that a thorough visual inspection by Fiore should have turned up evidence of contamination. Nor is there anything in the record to suggest that someone reviewing the detailed and recent Phase I environmental site assessment conducted by an acknowledged professional firm would be aware that it may have been inadequately or negligently performed. The Griffin report, on its face, stated an awareness of the past

commercial use of the property, the completion of a thorough Phase I environmental site assessment of potential contamination based on that history, and a determination following that assessment that no significant problems existed. These facts demonstrate, as the trial court found, that Fiore made a diligent and appropriate investigation and had no reason to know that a release or threatened release existed at the facility.[3]

¶ 39. Nonetheless, the State asserts that Fiore should have hired his own consultant to check the work done by Griffin, even though the State cannot point to anything on the face of the report suggesting the assessment was incomplete or negligently performed. There is no statutory basis for grafting such an absolute condition on the diligent-owner defense, particularly in the absence of any objective or subjective suspicions. Imposing such a condition would have its own public policy repercussions, such as potentially increasing the expense involved in each and every commercial real estate transaction. In effect, the State takes

---

[3] Justice Johnson's dissent echoes many of the State's arguments. Asserting that the VWMA is a strict-liability statute intended to protect the public, her dissent advocates precluding, as a matter of law, a landowner's good-faith reliance on any environmental assessment that turned out, in retrospect, to be negligently performed. See *post*, ¶ 54. The logic of this reasoning does not withstand scrutiny. Although the VWMA undeniably has strict-liability aspects to it, it also contains an explicit statutory defense that allows a landowner to avoid liability if he or she can demonstrate that, after making a "diligent and appropriate investigation" of the property, "he or she had no knowledge or reason to know" of a release or threatened release on the property. 10 V.S.A. § 6615(e). This diligent-owner defense is an exception to the strict liability standard normally imposed on landowners. Yet, were we to accept the position taken in Justice Johnson's dissent, it would effectively nullify that defense and impose strict liability even in cases such as this where the landowner had no knowledge of any contamination and relied upon a seemingly thorough professional assessment by a consultant upon which both the bank and the State had relied to make a diligent and appropriate investigation of the site.

Justice Johnson cites the Restatement (Second) of Agency § 215 (1958) to support her point that a negligent professional assessment should be attributable to whoever relies upon it, *post*, ¶ 64, but, apart from the fact that Griffin was not Fiore's agent, that section concerns an agent's conduct that "constitutes a tort to a third person." The section generally applies to trespasses, conversions, and interferences with pecuniary interests. See Restatement (Second) of Agency § 215 cmt. c. In this situation, the assessment itself did not constitute a tort and thus does not, under the Restatement, result in liability to a landowner who made the statutorily required diligent and appropriate investigation. The Restatement is inapposite.

the position that no purchaser of commercial real estate can rely on even multiple environmental assessments if those assessments prove to be inadequate. There is always a risk that existing contamination may not be detected by an assessment. Notwithstanding the State's insistence that Phase I assessments may be relied upon as long as they meet performance standards regardless of whether they detect contamination, its position would tend to mandate for every commercial real estate transaction a more thorough Phase II assessment. Such a requirement would involve extensive and costly soil sampling to assure the accuracy of a prior Phase I assessment, even in situations where there is no reason to doubt the first assessment. This, in turn, would tend to discourage the productive use of land by driving up transaction costs and would effectively nullify the statutory diligent-owner defense since no degree of diligence can guarantee accuracy.

¶ 40. The State further insists that Fiore cannot have made a diligent and appropriate investigation, given his claim in a lawsuit against Griffin that the company conducted a negligent and inadequate assessment.[4] We disagree. By its terms, the diligent-owner defense focuses on the investigation conducted, or reasonably relied upon, by the buyer at the time of purchase. There is no culpable nexus between the unknown poor quality of a consultant's investigation and the objective reasonableness of the buyer's efforts and reliance, the buyer's actual reliance, or the buyer's subjective knowledge or suspicion.

¶ 41. The State's reliance upon *LaSalle National Trust, N.A. v. Schaffner*, No. 91 C 8247, 1993 WL 499742 (N.D. Ill. Dec. 2, 1993), is unavailing. That court, in determining whether all appropriate inquiry had been made to escape liability under CERCLA, mentioned that although it was "alleged" that the purchaser of the contaminated property at issue had "hired a consultant for an environmental audit prior to the purchase," there was no evidence that the audit was consistent with good commercial practices and in fact the purchaser was alleging in another suit that the audit had not satisfied that standard. *Id.* at *7. But the court also stated that, "[m]ore importantly," the Phase I environmental site assessment arguably raised concerns that should have alerted the purchaser to potential contamination. *Id.* Accordingly, the court concluded that there were genuine issues of material fact preclud-

---

[4] Fiore sued Griffin after the State sued Fiore.

ing summary judgment in favor of the purchaser. *Id.* Here, in contrast, as the trial court found, there was no notice of contamination reasonably available to Fiore in the assessment or otherwise. Cf. *Goe Eng'g Co. v. Physicians Formula Cosmetics, Inc.,* No. CV 94-3576-WDK, 1997 WL 889278, at *13 (C.D. Cal. June 4, 1997) (granting summary judgment to defendant based upon conclusion that it had made all appropriate inquiries and had no reason to know of contamination, given that defendant purchased property at full fair market value, physically inspected property twice, and presented testimony that no contamination was discoverable by viewing property); *1325 "G" Street Assocs. v. Rockwood Pigments NA, Inc.,* No. Civ.A.DKC 2002-1622, 2004 WL 2191709, at **11-13 (D. Md. Sept. 7, 2004) (granting summary judgment to defendant based upon conclusion that company had made all appropriate inquiry under circumstances into whether contamination existed, even though no environmental assessment was conducted).

¶ 42. To the extent that the CERCLA innocent-landowner defense is relevant, we also find unavailing the State's reliance on that defense here to support its assertion that Fiore failed to make a sufficient investigation in this case.[5] The "innocent land-

---

[5] Justice Johnson's dissent cites *Hodgdon v. Mt. Mansfield Co.,* 160 Vt. 150, 165, 624 A.2d 1122, 1130 (1992), for the proposition that we generally look to similar federal law for guidance, and should look in particular to the innocent-landowner provision of CERCLA to resolve issues under the VWMA's diligent-owner defense. *Post,* ¶ 61. In *Hodgdon,* a disability discrimination case, we imported federal case law interpretation of the terms "handicapped individual" when the Vermont statutory definition was identical to the federal statute upon which our law was patterned. *Id.* The principle of *Hodgdon* is inapposite here, where the Vermont statute does not track its federal counterpart, and there is no federal case law interpreting the innocent-landowner defense to render a landowner, who has committed no further acts of disposal or obstructed remediation, strictly liable despite good faith reliance upon what purports and appears to be a valid Phase I environmental site assessment. Nor does the logic of *Hodgdon* extend to borrowing detailed statutory criteria enacted by Congress, but omitted at length from Vermont's legislation, to inform our interpretation of the state statute. The particular CERCLA factors in determining whether a purchasing landowner "did not know and had no reason to know" of contamination, 42 U.S.C. § 9601(35)(A)(i), are addressed in four interrelated subsections composed of some six hundred words and incorporating additional federal regulations. See *id.* § 9601(35)(A)(i), (B)(ii)-(B)(iv). If the Legislature intended to parrot the entirety of CERCLA on the topic of exculpatory diligence it could have done so, but did not. Cf. 9 V.S.A. § 2453(b) (stating legislative intent that courts, in construing state law on unfair or deceptive practices in commerce, be guided by comparable federal law); 9 V.S.A.

owner" defense provides that there shall be no liability for a person who can establish that a release or threatened release was caused solely by an act or omission of a third party other than one whose act or omission occurred in connection with a contractual relationship with the person. 42 U.S.C. § 9607(b)(3). Although the term "contractual relationship" includes land contracts, a purchaser may still escape liability if he did not know and had no reason to know of the contamination. *Id.* § 9601(35)(A)(i). To satisfy those conditions, the purchaser must have undertaken "all appropriate inquiries . . . into the previous ownership and uses of the facility in accordance with generally accepted good commercial and customary standards and practices." *Id.* § 9601(35)(B)(i)(I). The statute specifies various criteria for determining whether this condition has been met, including (1) "[t]he results of an inquiry by an environmental professional"; (2) interviews of past and present owners, operators, and occupants of the facility; (3) review of historical sources; (4) review of any government records regarding the handling of hazardous waste; (5) visual inspections of the property; (6) "[s]pecialized knowledge or experience on the part of the defendant"; (7) the relationship between the purchase price and the value of the property as if it were uncontaminated; (8) "[c]ommonly known or reasonably ascertainable information about the property"; and (9) the obviousness of the presence of contamination on the property. *Id.* § 9601(35)(B)(iii).

¶ 43. Notwithstanding the State's citation to federal regulations — regulations that were promulgated after the events that are the subject of this lawsuit — requiring that Phase I assessments meet certain objectives and performance standards, see 40 C.F.R. §§ 312.20(d), 312.20(e)(1), 312.20(f) & 312.23(c), virtually all of the relevant federal statutory criteria militate in favor of Fiore in this case. Fiore himself had no specialized knowledge of the dry-cleaning business or potential contamination posed by such a business. No contamination was obvious from observation of the site. As noted by the trial court, Fiore purchased the property for $125,000, which Fiore averred in an affidavit and his statement of

---

§ 4500(a)-(b) (stating legislative intent that certain provisions of Vermont's Fair Housing and Public Accommodations Act be construed consistent with federal Americans with Disabilities Act); *Hodgdon*, 160 Vt. at 165, 624 A.2d at 1130 (applying federal court interpretation of congressional definitions copied into state act). Nevertheless, a number of the CERCLA factors germane to diligence are considered in affirming the ruling of the trial court here. See ¶¶ 40-43.

undisputed facts was only two thousand dollars less than its appraised value.[6] Fiore had available to him the recent Griffin Phase I environmental site assessment indicating the absence of significant contamination, and in fact no significant contamination was discovered until soil testing was done, which is not part of a Phase I assessment. The company that conducted the assessment had also removed an underground tank on the subject property in 1992, at which time the company did not detect any pollution, and the State later relied on the company's report regarding the tank removal to inform the then-current owner that it was unaware of any threat to human health or the environment on the site. In January 2000, a hazardous material specialist for ANR, in seeking funding for cleanup of the property, stated in a letter to her supervisor that Fiore had done everything he reasonably could have done to ensure that he was not purchasing contaminated property, noting that all of the information he had at his disposal from consultants and the agency itself indicated the absence of contamination.

¶ 44. Before buying the subject commercial property for nearly its fully appraised value, Fiore looked into the possibility that the property was contaminated but concluded that it was not, relying in large part on a recent Phase I environmental site assessment that purported to have been completed in compliance with applicable and accepted performance standards. The assessment was recent, was conducted by professionals whom the State itself had relied upon in connection with the same property, and no other information available to Fiore indicated any significant contamination on the property. The State has not pointed to anything in the record, years after it filed suit, suggesting that Fiore acted in an improper or collusive manner with respect to his purchase of the foreclosed property. Given this record, there is no basis to overturn the trial court's award of summary judgment to Fiore.

¶ 45. The State argues, however, that the trial court erred by not allowing it to take further depositions to gather information in opposition to Fiore's motion for summary judgment based on the diligent-owner defense. According to the State, because discovery had not yet been closed in the case, it should have been given a

---

[6] The State responded by asserting that Fiore's statement was unsupported by specific citations to the record and thus hearsay, and in any case was not material to the diligent-owner defense. There does not appear to be any real dispute, however, as to whether Fiore paid close to fair market value for the property.

further opportunity to depose Fiore, Banknorth, Griffin, and an environmental consultant who filed an affidavit indicating that Fiore could not have known that the Griffin report was inadequate and had no reason to know of any contamination on the property.

■ ¶ 46. Once more, we find no error. In denying the State's request for additional discovery as to whether Fiore had made a diligent and appropriate investigation of the property and had any reason to know of the contamination later discovered there, the court noted that the State had filed the case three years earlier and that Fiore's motion for summary judgment had been pending for over a year. According to the court, the State failed to cite any particular need for additional discovery as required by Rule 56(f) of the Vermont Rules of Civil Procedure.[7] On appeal, the State

---

[7] Justice Johnson would have this Court remand the matter for the trial court to reconsider whether Fiore had made a diligent and reasonable investigation of any potential contamination, this time without taking into account Fiore's reliance upon the Griffin assessment. See *post*, ¶¶ 65-66, 70. Such a remand would be futile for no other reason than we have concluded that the trial court correctly considered Fiore's reliance on the assessment, among other things, in determining whether Fiore had satisfied the statutory diligent-owner defense. *Supra*, ¶¶ 37-38. We point out further, however, that with respect to Fiore's motion for summary judgment, the court concluded "that *there are no disputes of material fact, nor does it appear that additional time for discovery is warranted.*" (Emphasis added.) The court noted that the State had filed the case more than three years earlier, that Fiore's summary judgment motion had been pending for nearly one year, and that the State had "not cited any particular need for more discovery that it ha[d] not already had a reasonable opportunity to undertake." Moreover, on appeal, the State neither seeks a remand nor suggests that there are any material facts in dispute regarding any issue other than Fiore's reliance on the Griffin assessment. Indeed, the State argues only that (1) it is entitled to judgment as a matter of law; and (2) in the alternative, if the Griffin assessment can be considered with respect to Fiore's diligent-owner defense, the trial court erred by not allowing it to depose Fiore and others concerning his reliance upon the Griffin assessment. In short, no-one is arguing that there is any dispute as to any material facts apart from those concerning the Griffin assessment.

In his dissent, Chief Justice Reiber does not show that there are material facts in dispute but rather suggests that, given the current undisputed facts, Fiore is not entitled to judgment as a matter of law. See *post*, ¶ 79. Even the State does not advocate this position on appeal. The State's principal arguments are that (1) in light of Fiore's concession that the Phase I environmental site assessment was negligent, the trial court should be disallowed, as a matter of law, from considering Fiore's reliance upon the assessment as a basis for the diligent-owner defense; and (2) under the circumstances of this case, Fiore cannot prevail on that defense when we exclude his reliance on the assessment. The State also argues that, even if the

fails to demonstrate how the court abused its discretion in so ruling.

¶ 47. Rule 56(f) provides that if it appears "from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition," then "the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." In its filings in opposition to Fiore's motion for summary judgment, the State briefly requested, as an alternative to its primary legal theory that Fiore's knowledge was immaterial to his diligence defense, to depose Fiore and others pursuant to Rule 56(f).[8] The request was not supported by affidavit or explanation, as called for by Rule 56, as to why the discovery sought had been previously unavailable. Nothing was proffered to compel the court to grant the State the requested depositions at this point in the proceedings. As the court indicated, the State had plenty of time to develop its case and failed to articulate precisely what material facts essential to the State's opposition remained undiscovered. See *State v. Heritage Realty*, 137 Vt. 425, 429, 407 A.2d 509, 511 (1979) (stating that discovery should be ended when record indicates that it is not likely to produce genuine issue of material fact).

### III.

¶ 48. Finally, the State argues that the trial court erred in dismissing its common law nuisance claim. Again, we disagree. In dismissing the claim, the court ruled that the mere fact of pollution migrating offsite is not, in and of itself, sufficient to show

---

trial court properly considered Fiore's reliance on the assessment, the court erred by not allowing the State to take further depositions concerning his reliance on the assessment. In this opinion, we have rejected each of these arguments, upholding the trial court's view that Fiore's reliance on the assessment should be considered and that the State had already had ample opportunity to investigate that reliance. See *supra*, ¶¶ 37-38, 46. The State does not argue, however, that — assuming the trial court properly considered Fiore's reliance on the assessment and refused to give the State further opportunity to investigate his reliance on the assessment — that summary judgment was inappropriate or premature.

[8] This request to depose, without heading, elaboration, or separate motion, consisted of a single sentence included, respectively, within a twenty-two-page memorandum opposing summary judgment and a thirty-two-page response to Fiore's statement of facts.

a public nuisance, and, in any case, the State had not identified any specific public rights with which Fiore had interfered that suggested potential liability outside the scope of 10 V.S.A. § 6615. According to the court, the liability that the State sought to impose under its public nuisance claim is identical to the liability imposed by § 6615. The court noted that the VWMA does not preclude other civil or injunctive remedies "[e]xcept insofar as expressly provided in this section," *id.* § 6615(f), and that the diligent-owner defense is expressly provided in that section. *Id.* § 6615(e). The court concluded that the State cannot nullify this statutory defense by resorting to an alternative common law public nuisance theory.

 ¶ 49. We conclude that the State has failed to demonstrate that the trial court erred in dismissing its common law public nuisance claim. In determining that the State had failed to make a showing that the pollution on the subject property had reached the level of a public nuisance, the trial court noted that a public nuisance must impact a right common to the general public. See Restatement (Second) of Torts § 821B(1) (1979) ("A public nuisance is an unreasonable interference with a right common to the general public."); see also *Napro Dev. Corp. v. Town of Berlin*, 135 Vt. 353, 357, 376 A.2d 342, 346 (1977) ("[T]o be considered a public nuisance, an activity must disrupt the comfort and convenience of the general public by affecting some general interest."). The court cited a Restatement comment indicating that, for example, pollution of a stream that deprived lower riparian owners of the use of water for purposes of their land would not, in and of itself, be a public nuisance, but that a public nuisance would exist if, for example, the pollution prevented use of a public beach or killed the fish in a navigable stream. See Restatement (Second) of Torts § 821B cmt. g. The court stated that the mere fact that the pollution in this case had migrated offsite was not, in and of itself, an adequate showing of a public nuisance.

 ¶ 50. The State submits a one-page response to this aspect of the court's ruling, asserting only that the State of Vermont has expressed through statute and regulations a desire to protect its groundwater, and that having unpolluted groundwater is a general interest of the public. The State briefly asserts that the contaminated plume in this case exists hundreds of feet beyond the

subject property. Despite the trial court's ruling, the State does not indicate, other than noting the general public interest in protecting groundwater, how the contamination at the subject property affects or has the potential to affect the general public. Cf. *Allen v. Uni-First Corp.*, 151 Vt. 229, 231, 558 A.2d 961, 962-63 (1988) (where evidence demonstrated that hazardous chemicals from dry-cleaning business had been discharged into municipal sewage system and had contaminated numerous private wells, as well as town well, town landfill, and air around public schools, trial court charged jury on theories of both public and private nuisance).

¶ 51. Nor does the State cite any case in which a state or federal court has ruled that a defendant entitled to a statutory innocent-landowner defense is liable for the same conduct under a common law public nuisance theory. Rather, the State cites a federal appeals court case for the proposition that groundwater contamination provides a sufficient basis for imposing common law public nuisance liability. See *New York v. Shore Realty Corp.*, 759 F.2d 1032 (2d Cir. 1985). In that case, however, the court emphasized that a public nuisance, under New York law, involves conduct that interferes with public rights common to all in a manner that endangers the property, health, or safety of a considerable number of persons. *Id.* at 1050. This is precisely what the trial court ruled that the State had failed to show in this case.

¶ 52. The State also cites *Shore Realty* for the proposition that it is appropriate to impose public nuisance liability on current owners of contaminated properties even if they did not cause the contamination. In making this point, however, the court in *Shore Realty* noted that the current owner had purchased the property with knowledge of its contaminated condition and further stated that the trend toward limiting the liability of successor landowners "clearly does not extend to successor owners who knew about the condition of the land before purchasing it." *Id.* at 1050 n.25. In the instant case, of course, the State is seeking to extend liability to Fiore based on a common law public nuisance theory even if he is not liable under the VWMA because he had no reason to know of the contamination following an appropriate and diligent investigation. We need not decide in this case whether the VWMA always precludes public nuisance claims under such circumstances because, in this case, the State has not demonstrated that the

trial court erred in concluding that the State failed to make a prima facie showing of a public nuisance.

*Affirmed.*

¶ 53. **Johnson, J.,** dissenting in part, and concurring in part. I concur with Part I of the majority's opinion, but considering the remedial purpose of the Vermont Waste Management Act (VWMA) combined with its strict liability statutory framework, I cannot agree that a landowner is able to escape liability simply by pointing to a negligently conducted environmental assessment given to him by the party selling him the subject property. If that is all it takes to meet the VWMA's exception from liability, then the tail is wagging the dog. Contrary to the arguments implicit in defendant Fiore's diligent-owner defense, the VWMA was not intended to be an economic redevelopment statute. Instead, it is a strict liability statute enacted to protect the public from the health and environmental consequences of hazardous waste contamination, and thus its exceptions to liability for current owners of contaminated property are necessarily narrow. Accordingly, I dissent from Part II of the majority's decision.

¶ 54. The majority errs by focusing solely on whether it was reasonable for Fiore to rely on an admittedly "flawed" environmental assessment of the land. *Ante*, ¶¶ 34, 38. Such an interpretation of the VWMA undercuts the law's strict liability scheme and expands a narrow exception to liability by ignoring the fact that the assessment upon which Fiore relied — regardless if that reliance was reasonable — was worthless. Once Fiore is precluded from using the negligently performed environmental assessment to make out an affirmative diligent-owner defense, there remain factual questions as to whether his inquiry amounted to a diligent investigation; thus, I would conclude that summary judgment on this issue was premature, and I respectfully dissent.[9]

¶ 55. The facts and complicated procedural history of this case are set forth in detail by the majority. *Ante*, ¶¶ 2-10. Fiore purchased the subject property in March 1999 and opened a pizzeria shortly thereafter. At the time of purchase, the property

---

[9] I concur, however, with the majority that the discovery sanction issued by the trial court against the State was warranted and that summary judgment in favor of Banknorth was appropriate. I also agree with the majority that the State's late discovery requests were properly denied and that the State was precluded from bringing its common law nuisance claim.

was owned by Banknorth, which had foreclosed on the property in 1997. The previous owner had used the property from 1996 until 1997 to operate a bakery. Before its use as a bakery, the property was owned from 1970 to 1996 by David Benvenuti and Howe Cleaners, who used the property to operate a dry-cleaning business. It was during the property's use for dry cleaning that hazardous waste, such as perchloroethylene (PCE), was released onto the property. The release of this hazardous waste has resulted in contamination of the air within the building located on the property as well as migration of contaminants to underlying and adjoining properties through contaminated soils and ground-water. Vermont's Agency of Natural Resources (ANR) has incurred over $300,000 in response costs to clean up the contamination, and the site remains contaminated.

¶ 56. At the time he purchased the property, Fiore was aware of the property's past use as a dry-cleaning site, but maintained that there was no physical indication of present contamination. Just prior to purchase, Banknorth furnished Fiore with a Phase I environmental site assessment report prepared in 1998 by Griffin International, Inc., an environmental consulting and engineering company. The assessment, which all sides now concede was negligently conducted, concluded that "the property presented no significant environmentally hazardous conditions" and recommended "no further investigation." Fiore also claims he justifiably relied on assurances from ANR that the site presented no health hazards. Fiore subsequently purchased the property and opened his pizzeria.

¶ 57. Following its discovery of contamination, the State brought a cost recovery action against Fiore and the previous owners of the property. In response to that action, Fiore moved for summary judgment, arguing that he was shielded from liability under the VWMA on a diligent-owner defense. See 10 V.S.A. § 6615(e).[10] The trial court ruled in favor of Fiore, concluding that "it is reasonable for a person to rely on a recently produced, professional Phase 1 environmental report . . . and that such reliance is sufficient to constitute diligent and appropriate investigation as a

---

[10] Fiore also claims he is entitled to the defense set forth in 10 V.S.A. § 6615(d). Though the applicability of this defense was not addressed in the trial court's order, it would appear that this defense is not available to Fiore because, as a purchaser of contaminated land, he is in an indirect contractual relationship with the third party he claims is responsible for the contamination.

matter of law." The court further noted that even though the Griffin report was negligently conducted, the State had not produced evidence that would have "put Fiore on notice of either existing contamination or a faulty investigation or report by Griffin." On appeal, the State argues — and I agree — that a negligently performed assessment cannot form the basis of a diligent-owner defense.

¶ 58. The purpose and statutory scheme of the VWMA, and its federal counterpart the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), indicate that the remedial goals of these statutes were intended to be quite broad and that the exceptions to liability quite narrow. By enacting the VWMA, the Vermont Legislature sought to address "the increasingly complex social, economic and legal problems of managing solid and hazardous wastes." *State v. Ben-Mont Corp.*, 163 Vt. 53, 57, 652 A.2d 1004, 1007 (1994); accord *State v. Carroll*, 171 Vt. 395, 400, 765 A.2d 500, 503 (2000) ("The statutory scheme is intended to hold all parties responsible for hazardous materials contamination accountable for the costs associated with its proper clean-up and disposal."). The same impetus to impose strict liability on those responsible for the problems caused by the treatment and disposal of hazardous waste motivated enactment of CERCLA. See *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 21 (1989) ("The remedy that Congress felt it needed in CERCLA is sweeping: *everyone* who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup."); *Walls v. Waste Res. Corp.*, 823 F.2d 977, 980 (6th Cir. 1987) (noting that CERCLA was enacted to require responsible parties to "bear the costs and responsibility for remedying the harmful conditions they created" (quotation omitted)).

¶ 59. Thus, the VWMA provides that a person who currently owns or operates a facility on which contamination has occurred, regardless of whether the current owner or operator is directly responsible for the contamination, shall be liable for "abating such release or threatened release" and for the "costs of investigation, removal and remedial actions incurred by the state which are necessary to protect the public health or the environment." 10 V.S.A. § 6615(a)(4)(A)-(B). The statute explicitly holds responsible parties strictly liable "for all cleanup, removal and remedial costs." *Id.* § 6615(c).

¶ 60. One of the limited exceptions to liability under the VWMA is what the trial court referred to as the "diligent owner" affirmative defense:

> Any person who is the owner or operator of a facility where a release or threatened release existed at the time that person became owner or operator shall be liable unless he or she can establish by a preponderance of the evidence that after making diligent and appropriate investigation of the facility, he or she had no knowledge or reason to know that said release or threatened release was located on the facility.

*Id.* § 6615(e). Presumably, the Legislature added this limited exception to liability to incentivize inquiry into whether purchased property is contaminated and to prevent unfairness that would result from holding a purchaser of contaminated land liable when he made every reasonable effort to determine if the land was contaminated before purchase. The passive landowner, however, who turns a blind eye to potential contamination on his newly acquired land, cannot escape liability.[11]

¶ 61. The VWMA largely tracks its federal precursor, CERCLA.[12] Thus, we look to interpretation and application of the

---

[11] Given the strict liability framework and remedial purpose of CERCLA, federal courts have adopted a narrow interpretation of the comparable innocent-landowner defense. For instance, the First Circuit has noted:

> As an acquiring party and an owner of the facility during a period of "passive" disposal, [defendant] would be held to an especially stringent level of preacquisition inquiry — on the theory that an acquiring party's failure to make adequate inquiry may itself contribute to a prolongation of the contamination.

*In re Hemingway Transp., Inc.*, 993 F.2d 915, 932-33 (1st Cir. 1993) (footnote omitted); accord *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 845-46 (4th Cir. 1992) ("A CERCLA regime which rewards indifference to environmental hazards and discourages voluntary efforts at waste cleanup cannot be what Congress had in mind."). The same policy reasons that dictate narrow interpretation of the exceptions to liability under CERCLA necessitate a similar interpretation of exceptions to liability under the VWMA, especially given the similarity between the two schemes.

[12] The VWMA's diligent-owner defense, for instance, is substantially similar to the innocent-landowner defense contained in CERCLA. Under 42 U.S.C. § 9601(35)-(A)(i), a person may qualify for the innocent-landowner defense if:

> At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which

comparable federal innocent-landowner defense for guidance in interpreting our own provision. See *Hodgdon v. Mt. Mansfield Co.,* 160 Vt. 150, 165, 624 A.2d 1122, 1130 (1992) (noting that "[b]ecause the Vermont Legislature patterned our handicap-discrimination statute on federal legislation, we look to federal case law for guidance in construing the definitions at issue").[13] The innocent-landowner defense in CERCLA focuses on whether a purchaser of contaminated property had "reason to know" of the contamination at the time of purchase. 42 U.S.C. § 9601(35)(A)(i). Unlike the VWMA, CERCLA (as set forth during the relevant time period of this action) provides explicit guidance on how a defendant may establish that it had "no reason to know" of a prior disposal:

> To establish that the defendant had no reason to know . . . the defendant must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability. For purposes of the preceding sentence the court shall take into account any specialized knowledge or experience on the part of the defendant, the relationship of the purchase price to the value of the property if uncontaminated, commonly known or reason-

---

is the subject of the release or threatened release was disposed of on, in, or at the facility.

[13] The majority criticizes the use of CERCLA's innocent-landowner defense as helpful guidance for interpretation of our own diligent-owner defense, seemingly arguing that the Legislature in Vermont intended to adopt a much broader exception to liability under the VWMA. *Ante,* ¶ 42 n.5. The majority cites no authority that directly supports this proposition, and it is difficult to believe that, where much of the statutory provisions of the VWMA are taken word-for-word from CERCLA, the Legislature intended the VWMA to depart from CERCLA in this way. Such an interpretation would be woefully out of line with other areas of environmental protection law in Vermont, where the regulatory scheme is often more stringent than federal counterparts. Cf. *Jipac, N.V. v. Silas,* 174 Vt. 57, 62-63, 800 A.2d 1092, 1097 (2002) (noting strong environmental protection policy behind Vermont's Act 250); *In re Town of Sherburne,* 154 Vt. 596, 601 n.6, 581 A.2d 274, 277 n.6 (1990) (noting that in context of interaction between Vermont's Water Quality Standards and federal Clean Water Act, "[b]ecause state regulations may impose more rigorous standards than the federal counterparts, state agencies should first look to the state regulations for guidance").

ably ascertainable information about the property, the obviousness of the presence or likely presence of contamination at the property, and the ability to detect such contamination by appropriate inspection.

*Id.* § 9601(35)(B) (1999).[14]

¶ 62. The performance of a Phase I environmental site assessment, which courts considered the customary commercial practice even before the 2002 amendments to CERCLA codified it as the baseline, acts as a safe harbor to CERCLA liability. See *R.E. Goodson Constr. Co. v. Int'l Paper Co.*, Civil Action No. 4:02-4184-RBH, 2006 WL 4916336, at *38 (D.S.C. Dec. 15, 2006) (considering whether landowner had met his burden under pre-2002 CERCLA innocent-landowner defense and concluding that "customary practice" included performance of Phase I assessment and that performance of such assessment provided "safe harbor" to escape CERCLA liability); see also *United States v. Domenic Lombardi Realty, Inc.*, 290 F. Supp. 2d 198, 211 (D.R.I. 2003) (citing expert testimony that environmental assessment of property was required to satisfy "good commercial or customary practices" for purchasing property).

---

[14] It may very well be that the analysis employed to determine whether Fiore made out his diligent-owner defense is hopelessly stuck in time. Subsequent to Fiore's purchase of the relevant property, Congress and the Environmental Protection Agency recognized that evolving technology and savvier land purchasers necessitated a narrower definition of "all appropriate inquiry" under CERCLA, one that takes into account more modern commercial practices. Thus, in 2002, CERCLA's innocent-landowner affirmative defense provision was amended to provide clarity to courts and purchasers of land alike. The 2002 "Brownfields Amendments" clarified the "all appropriate inquiry" standard, stating that purchasers of property before May 31, 1997, shall take into account such things as commonly known information about the property, the value of the property if clean, the ability of the defendant to detect contamination, and other similar criteria. 42 U.S.C. § 9601(35)(B)(iv)(I). For property purchased on or after May 31, 1997, the procedures of the American Society for Testing and Materials, including the document known as Standard E1527-97, entitled "Standard Practice for Environmental Site Assessment: Phase 1 Environmental Site Assessment Process," were to be used until EPA promulgated regulations. 42 U.S.C. § 9601(35)(B)(iv)(II). The EPA promulgated regulations further clarifying what amounted to "all appropriate inquiry" in 2005. See 40 C.F.R. § 312.20(e) (noting that all appropriate inquiries may include results of environmental reports, provided those reports meet certain objectives and performance standards). I agree with Fiore, however, that the appropriate standard that guides analysis in this case was that in existence in 1999 when Fiore purchased the property.

¶ 63. The fact that a defendant is merely shown an environmental assessment, however, may not be enough to escape liability. Rather, the adequacy of the assessment is a crucial fact in determining whether it is even relevant to a diligent-owner defense. See *LaSalle Nat'l Trust, N.A. v. Schaffner*, No. 91 C 8247, 1993 WL 499742 (N.D. Ill. Dec. 2, 1993). In *LaSalle National Trust*, the court considered whether evidence presented by the defendant that he had hired a professional consultant to conduct an environmental audit before purchasing the land in question and that the audit had yielded no evidence of contamination could meet the "all appropriate inquiry" requirement under CERCLA. *Id.* at *7. The court looked at evidence beyond the mere fact that an environmental investigation was conducted and inquired into whether the audit was "consistent with good commercial and customary practices." *Id.* As part of this analysis, the court considered the fact that the defendant itself had brought an independent action against the consultant alleging that the consultant had been negligent in its investigation. *Id.* The court refused to grant summary judgment on the basis of the facts presented, finding instead that genuine issues of fact existed as to whether the inquiry made by the defendant was sufficient to escape liability. *Id.*[15] See also *S.S. & G, LLC v. California*, No. 02:02-CV-2514-GEBJFM, 2005 WL 2016843, at *2 (E.D. Cal. 2005) (noting that questions of fact were raised as to whether environmental consultants performing Phase I assessment "exercised a level of care in accordance with generally accepted and local standards of professional practice in effect at the time" and thus summary judgment was inappropriate for this issue).

¶ 64. The reasoning behind imputing a professional environmental consultant's negligence to the landowner who relies upon it is straightforward: when a defendant relies upon a professional company's performance of an environmental assessment to meet his burden to conduct a diligent investigation, he adopts whatever investigation is performed by the professional company as his own. This is hardly a new concept of law and one that makes sense in

---

[15] The majority attempts to distinguish *LaSalle* by focusing on the fact that in that case the Phase I assessment raised concerns that should have alerted the purchaser to contamination. *Ante,* ¶ 41. This fact may have indicated that there were other factors present suggesting that the landowner should have been aware of the contamination, but it does not answer the question of whether any weight should be given to a negligently performed assessment.

this context given the remedial purpose and strict liability framework of the VWMA. See Restatement (Second) of Agency § 215 (1958) ("A master or other principal who unintentionally authorizes conduct of a servant or other agent which constitutes a tort to a third person is subject to liability to such person."); see also *In re Desautels Real Estate, Inc.*, 142 Vt. 326, 337, 457 A.2d 1361, 1366 (1982) ("The law of vicarious liability has long been recognized in Vermont as but an outgrowth of the maxim respondeat superior. Vicarious responsibility has been defined as an indirect legal responsibility, as for example, the liability of an employer for the acts of an employee, or a principal for the torts and contracts of his agent." (citation omitted)). Thus, though I agree with the majority that performance of a *valid* Phase I assessment may indicate a purchaser's due diligence under § 6115(e), I cannot agree that a negligently performed assessment should be given any weight.

¶ 65. Here, all sides agree that the Phase I environmental site assessment performed by Griffin International was negligently conducted. It may well be that the Griffin report was objectively dependable or that Fiore had no reason to be suspicious of the report's legitimacy, *ante*, ¶ 38, but this guise of authority does not change the fact that the report was essentially worthless. Indeed, the end result is as if no environmental assessment had been performed at all. Thus, I cannot agree that the mere fact that Fiore happened to be given an assessment — especially by the entity attempting to convince him to buy the property — is enough, as a matter of law, to shield him from liability under the VWMA. This fact alone does not necessarily mean that Fiore automatically fails in making out his diligent-owner affirmative defense. Instead, Fiore merely loses the "safe harbor" from liability that performance of a valid Phase I assessment normally provides. Indeed, the performance of a Phase I assessment is only one factor that courts consider in determining whether a landowner can prevail on an affirmative defense to liability; Fiore, therefore, is left to point to other evidence indicating that he met his burden. See 42 U.S.C. § 9601(35)(B)(iii) (1999) (listing factors); *Maturo v. Comm'r of Dep't of Envtl. Prot.*, No. CV910313753S, 2008 WL 1734580, at *10 (Conn. Super. Ct. Mar. 19, 2008) (concluding that though defendant had made some inquiry, there were multiple warning signs that should have alerted him to contamination, such as the land's past use as gas station); *BCW*

*Assocs., Ltd. v. Occidental Chem. Corp.*, Civ. A. No. 86-5947, 1988 WL 102641, at *21 (E.D. Pa. Sept. 29, 1988) (rejecting innocent-landowner defense in situation where defendant had conducted several environmental studies, none of which were found to be deficient, but where "[i]n light of [the plaintiff's] knowledge concerning the dust in the warehouse and the nature of [the defendant's] activities, it cannot be said that it exercised due care or took adequate precautions").

¶ 66. After the assessment falls out of the equation, there are simply not enough facts on which the trial court could rule on Fiore's diligent-owner defense as a matter of law. Fiore asserted the following in support of his diligent-owner claim: (1) he did nothing to contaminate the property; (2) he had no actual knowledge of the contamination; (3) physical inspection did not indicate any contamination; (4) he paid $125,000 for the property, which had been assessed at $127,000; (5) he had no specialized knowledge of the dry-cleaning business; (6) following a tank pull report and investigation (conducted by Griffin) of the underground tanks on the property, Fiore was told by ANR that the agency was not aware of any health threat from the site; and (7) in 2000, he was told by a hazardous materials specialist at ANR that he had done "everything he could reasonably do to insure he was not purchasing an impacted piece of property." See 42 U.S.C. § 9601(35)(B) (1999) (listing statutory factors indicating all appropriate inquiry, including "obviousness of the presence" of the contamination, "ability to detect" the contamination, the "specialized knowledge or experience" of the defendant, and the "relationship of the purchase price to the value of the property").

¶ 67. On the other side, the State presented the following evidence demonstrating that Fiore should have discovered the contamination: (1) Fiore was aware that the property was formerly used as a dry-cleaning business; (2) Fiore has brought suit against Griffin International for negligence, in which Fiore has alleged that Griffin should have inquired further into the significance of the storage of dry-cleaning chemicals on the property and should have been aware that the previous owner improperly disposed of dry-cleaning chemicals; (3) the tank pull report submitted to ANR in 1997 and indicating that the site was free of health hazards involved a different inquiry and is irrelevant to the diligent-owner defense here; (4) there were two abandoned storage tanks, one of which contained some liquid and emanated PCE

odors, on the property of which Fiore should have been aware; and (5) multiple environmental assessments indicated that the land was contaminated.

¶ 68. Because inquiry into whether a defendant has made out a diligent-owner defense is fact intensive, summary judgment on this issue is rarely appropriate. See *United States v. 150 Acres of Land*, 204 F.3d 698, 707 (6th Cir. 2000) (concluding that because particular inquiry necessary for defendant to establish innocent-landowner defense to CERCLA liability "is clearly dependent on the totality of the circumstances" and is thus "a very fact-specific question," summary judgment was inappropriate to establish that, as matter of law, defendant's actions did not amount to "appropriate inquiry"); *Advanced Tech. Corp. v. Eliskim, Inc.*, 87 F. Supp. 2d 780, 785 (N.D. Ohio 2000) (noting that "[w]hat constitutes appropriate inquiry is a mixed question of law and fact and will depend on the totality of the circumstances"). Here, there is at least a factual question as to whether the inspection conducted by Fiore could meet the diligence requirement under § 6615(e).

¶ 69. The majority suggests that it would be unfair to preclude a landowner from showing he made at least some effort in obtaining an environmental investigation, even though the investigation turned out to be negligently performed. *Ante*, ¶ 38. Though in some instances the result may be unfair to an individual defendant, the statutory scheme of the VWMA, like that of CERCLA, is strict liability. See *United States v. Price*, 577 F. Supp. 1103, 1114 (D.N.J. 1983) ("Though strict liability may impose harsh results on certain defendants, it is the most equitable solution in view of the alternative — forcing those who bear no responsibility for causing the damage, the taxpayers, to shoulder the full cost of the clean up."); see also *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 716-17 (2d Cir. 1993) ("There may be unfairness in the legislative plan, but . . . we still must take [CERCLA] as it is.").[16]

---

[16] Moreover, and as Fiore is well aware, a defendant who has been wronged by an environmental consulting company is not without recourse. In *WATCO v. Pickering Environmental Consultants, Inc.*, for instance, the state appeals court addressed whether an environmental consulting agency had engaged in negligent misrepresentation when it prepared what ended up being an inaccurate Phase I assessment. No. W2006-00978-COA-R3-CV, 2007 WL 1610093 (Tenn. Ct. App. June 5, 2007); see also *Iron Partners, LLC v. Dames & Moore*, No. C07-5643RBL, 2009 WL 1587898 (W.D. Wash. June 8, 2009). The court found that the standard of care

¶ 70. For these reasons, I would conclude that summary judgment in favor of Fiore was inappropriate, and I would remand for resolution by the trier-of-fact whether Fiore has made out his diligent-owner defense. I respectfully dissent from Part II of the majority's opinion.

¶ 71. **Reiber, C.J.,** dissenting in part, and concurring in part. I concur with Part I of the majority's opinion, but I agree with Justice Johnson that Fiore was not entitled to summary judgment in his favor and that a remand is appropriate. I write separately because I believe that whether Fiore reasonably relied exclusively on the Phase I environmental site assessment is a question of fact to be decided by the trier of fact if Fiore is to benefit from the diligent-landowner affirmative defense. In my view, a fact-finder must decide whether Fiore reasonably relied on this assessment, and whether on all of the facts Fiore has satisfied the requirements of 10 V.S.A. § 6615(e). I therefore dissent.

¶ 72. To be entitled to the diligent-landowner defense, Fiore needed to establish "by a preponderance of the evidence that after making diligent and appropriate investigation of the facility, he . . . had no knowledge or reason to know that said release or threatened release was located on the facility." 10 V.S.A. § 6615(e). Fiore argued below that these requirements were satisfied as a matter of law because, prior to purchasing the property, he was shown a Phase I report prepared by Griffin International, Inc. The report, which was prepared at the behest of the seller, concluded that the property presented no significantly environmentally hazardous conditions and recommended no further investigative work. Fiore argued that he reasonably relied on the report's conclusions. "If professional engineers could not detect the presence of the dry cleaning chemicals," Fiore argued, "then obviously [he] should not be expected to have detected those chemicals."

¶ 73. Fiore also claimed that he had no specialized knowledge of dry cleaning or the chemicals involved in that business; he had not observed anything on the property suggestive of contamination; there were no obvious indicators of recent dry cleaning on the property; and he had purchased the property for slightly less than

---

is "that level of care and diligence ordinarily employed by the average firm practicing in the same geographic area and at the same time." *WATCO*, 2007 WL 1610093, at *21.

its appraised value. Fiore provided an opinion from an expert that the Phase I report "purported" to have been completed in accordance with standard practice guidelines, and that a layperson reviewing the Phase I assessment would have reasonably concluded that he had conducted an appropriate inquiry "necessary to qualify for the innocent landowner defense."

¶ 74. The State opposed Fiore's motion, relying heavily on Fiore's lawsuit against Griffin, and Fiore's allegations in that litigation that the Phase I assessment had been negligently prepared. According to the State, Fiore presented no evidence or legal support for the proposition that a buyer's subjective reliance on a Phase I report prepared by a seller constituted a diligent and appropriate investigation of a former dry-cleaning facility, without regard to whether the assessment itself was a diligent and appropriate investigation. The State maintained that Fiore was not entitled to rely blindly on any Phase I investigation report and thereby avoid liability, particularly given Fiore's allegations in related litigation that the report did not comply with standard practice guidelines. The State argued that, at a minimum, these allegations demonstrated a material question of fact as to whether there had been a diligent and appropriate investigation in this case.

¶ 75. The State also asserted that a reasonable investigation would have revealed the presence of contaminants. It presented evidence that its environmental consultant had been able to enter a crawl space beneath the building. The consultant located a variety of pipes, determined that several were connected to tanks beneath the building, and observed two abandoned storage tanks that were later found to be contaminated with hazardous material commonly used in dry-cleaning operations. The State added that while Fiore asserted that the purchase price was close to the appraised value of the property, he provided no admissible evidence to support this contention. Additional filings by both parties followed.

¶ 76. I believe the State presented sufficient evidence to show the existence of a genuine factual dispute as to whether Fiore reasonably relied on the Phase I report, and whether his investigation was diligent and appropriate under the circumstances. As recounted above, Fiore claimed only that he was "shown" a report prepared at the request of the seller. The report identified the property as a "closed site on the Vermont Hazardous Waste Site

list," and indicated that it had been used as a dry-cleaning business for almost thirty years. The report referred to the disposal of dry-cleaning waste, stating that the "[d]ocumentation of the proper disposal of dry cleaning wastes was reviewed previously and documented in the previous Phase I report." Fiore did not assert that he had sought, been shown, or reviewed this related Phase I report, although he alleges in related litigation against Griffin that this statement — that the previous assessment had documented proper disposal of dry-cleaning waste — was false. As discussed above, the parties concede that the Phase I report was negligently conducted. *Ante,* ¶ 65.

¶ 77. Because this was a summary judgment proceeding, we must give the State "the benefit of all reasonable doubts and inferences." *Doe v. Forrest,* 2004 VT 37, ¶ 9, 176 Vt. 476, 853 A.2d 48. Thus, one could argue that information about the property's past use and its placement on a hazardous waste-site list might have prompted Fiore to undertake a more thorough evaluation of the property. Similarly, one might argue that a diligent and reasonable investigation would have uncovered the two underground storage tanks on the property, which were accessible via a crawl space under the building. Ultimately, these are questions that a fact-finder must resolve. As noted above, I am not persuaded that a landowner's reliance on a Phase I report, which is later determined to be negligently prepared, must be excluded from this analysis. Cf. *ante,* ¶ 57. The apparent reliability of the Griffin report, and Fiore's alleged reliance on it, are relevant factors that must be evaluated by a fact-finder, and the weight to be given such evidence is exclusively for the trier to determine.

¶ 78. The problem is that the majority inappropriately acts as the fact-finder here, weighing the evidence and concluding that the statutory requirements are satisfied. *Ante,* ¶ 37. In reaching its conclusion, it relies in part on a finding that there was nothing in the record to suggest that a thorough visual inspection by Fiore should have turned up evidence of contamination. *Ante,* ¶ 38. But, as noted above, the State presented evidence that its inspection of the property revealed two abandoned storage tanks that contained hazardous material. The majority also finds that Fiore purchased the property at close to its appraised value. *Ante,* ¶ 43. It states that the property had been recently appraised, as uncontaminated, at $127,000. *Id.* There is no admissible evidence to this effect in the record, however, as the State pointed out below.

¶ 79. As we have often repeated, "[s]ummary judgment is not a substitute for a determination on the merits, so long as evidence has been presented which creates an issue of material fact, no matter what view the court may take of the relative weight of that evidence." *Vt. Envtl. Bd. v. Chickering*, 155 Vt. 308, 319, 583 A.2d 607, 613-14 (1990). As Justice Johnson observes, a landowner's entitlement to the benefit of the diligent-owner defense is an inherently fact-specific query, and one that is generally inappropriate for resolution on summary judgment. *Ante*, ¶ 68 (citing cases to this effect). Reasonable minds could disagree over whether Fiore made a diligent and appropriate investigation under the totality of the circumstances here. I would thus reverse the trial court's summary judgment decision, and remand this case for resolution of outstanding factual questions.