*State v. Parkway Cleaners*, No. 480-7-10 Wncv (Teachout, J., Jan. 22, 2018).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

**STATE OF VERMONT**

**SUPERIOR COURT**                                                     **CIVIL DIVISION**
**Washington Unit**                                                   **Docket # 480-7-10 Wncv**


**STATE OF VERMONT**
**AGENCY OF NATURAL RESOURCES**

>        **v.**

**PARKWAY CLEANERS, et al.**


**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

The Vermont Agency of Natural Resources (ANR or the State) seeks remedies for environmental contamination related to a former dry cleaning business in the Town of Hartford.

There were initially several Defendants in the case. The claims against the others have been resolved. Judgment issued by default on June 11, 2015 against the following former operators of the dry cleaning business: Paul D. Gendron, Parkway Cleaners, and Paul D. Gendron dba Parkway Cleaners. The Fournier Defendants, who also operated the dry cleaning business for a time after Gendron, settled with the State for $100,000 in March of 2014. Third party Defendant Town of Hartford has been dismissed from the case.

The remaining Defendants are Richard S. Daniels and Hazen Street Holdings, Inc., a corporation organized and controlled by Mr. Daniels that is currently the title owner of the subject property. On August 5, 2014, summary judgment was granted to the State imposing liability on Mr. Daniels as owner of the property.[1] A motion to reopen the issue of liability was denied on September 2, 2016. The 2014 ruling provided for a period of discovery on the issue of damages, and ordered a hearing on "the amount of past damages, prejudgment interest, the amount to be credited from the Fournier settlement, and the terms of injunctive relief."

That hearing took place on April 20 and 21 and June 29 and 30, 2017. The State was represented by Attorneys Kyle Landis-Marinello and Nicholas F. Persampieri. Richard S. Daniels and Hazen Street Holdings, Inc. were represented by Attorney R. Bradford Fawley and Merrit S. Schnipper.

Post-trial memos and proposed findings have been filed by attorneys for both parties.

---

[1] "Daniels, not HSH, is the current owner regardless of which time frame applies to that determination. 10 V.S.A. § 6615 (a)(1)." 2014 Decision, page 10. "Daniels has current owner liability in this case under 10 V.S.A. § 6615 (a)(1)." *Id.* at page 11.

## Motions

At the close of the State's case, Defendants made oral motions, which are ruled upon as follows.

Defendants renewed the Motion for Judgment on the Pleadings that was denied at the beginning of the hearing on April 20, 2017. The motion is again denied for the same reasons as stated on the record.

Defendants moved for dismissal on several grounds:

*Failure to prove grounds for injunctive relief.* Defendants argue that the State had a remedy at law, and therefore did not show a legal basis for injunctive relief. Since injunctive relief was authorized in the 2014 Decision, this is a request to reopen and revisit that Decision. Grounds to reopen have not been shown. Moreover, the specific statute providing for liability also provides that when liability is established and the defendant does not undertake performance of the necessary work, the State is entitled to an order requiring the Defendant to take specific actions. See 10 V.S.A. § 8221(b)(2) and the Conclusion of Law regarding injunctive relief set forth below. Therefore, the motion is denied on this ground.

*Statute of Limitations.* This is also a request to revisit a prior legal ruling of the court, and is denied. The prior decision was supported by the evidence at the hearing, which showed that it was not until 2006, which is within the statute of limitations period, that testing provided reliable evidence that the property of the Defendants was the source of the contamination that is the subject of this case.

*Liability.* Defendants again request review of prior rulings. Specifically, Defendants argue that as owner they should not have full liability both because they claim they were not responsible for a "release" and because they argue that their liability under the statute should be proportional. They raise no arguments that have not already been considered by the court, and the request to revisit the issue of liability is again denied.

*Damages.* Defendants argue that the damages the State seeks are special damages that were not specifically identified in pleadings. The court denied Defendants' pretrial motion on this argument at the outset of the trial on April 20, 2017 and affirms that ruling now.

*Sufficiency of evidence.* In addition, Defendants challenge the sufficiency of the evidence, but as set forth below, some of the State's evidence supported judgment, so that motion is also denied.

## Findings of Fact

*History*

The subject parcel of property on which the dry cleaning business was operated, referred to in this decision as the "Parkway Lot," is a small lot adjacent to a property on which is or was located a trucking business owned by Mr. Daniels, informally called RSD Trucking in this decision. There are a few other business properties nearby, but the Parkway Lot is on a corner

2

largely surrounded by a residential neighborhood with small lots and modest homes. The block in which the Parkway Lot is located is on Maple Street (Route 14) in the Town of Hartford. On the other side of Maple Street is the White River. See copies of Defendants' Exhibits F and D, attached, for a layout and identification of the properties and local features.[2]

The State first became aware of contamination problems in this neighborhood in 1987. A spill occurred at Parkway Cleaners and the owner was asked to clean it up. In 1989, the State found the contaminant PERC on the adjacent St. Johnsbury Trucking (later RSD Trucking) property under a tank. PERC, or tetrachloroethene, is a chemical also known as PCE that is used in dry cleaning and for degreasing metal parts. It is a carcinogen. Although it attenuates over time, it takes a very long time to do so. At the request of the State, the owner installed a monitoring well. At that time, in 1989, there was no information that the PERC that was discovered was having an effect on human health. In 1989 or 1990, the dry cleaning business stopped operating on the neighboring Parkway Lot.

By 1994, RSD Trucking owned the St. Johnsbury Trucking property, and the State asked it to conduct testing in the monitoring wells on its property, which it subsequently did.

In 1995, the Parkway Lot went to a tax sale. Richard S. Daniels, principal owner of RSD Trucking, was the high bidder at the tax sale and purchased it for $2,278.38 in his individual capacity.

In 1996, the State received information showing the presence of PERC on the Mowers News Service property located on the opposite side of the trucking property from the Parkway Lot. The Mowers News Service property is downgradient from the Parkway Lot, suggesting the possibility that the contaminant had migrated from the Parkway Lot, although Mowers operated its own fleet of vehicles and there was also the possibility that the PERC came from its own activities. In 1999, a Report from the RSD testing in 1995 and 1999 showed PERC in the trucking property monitoring well. This PERC could have come from the Parkway Lot.

By 2002, RSD had done a Phase I Report on the RSD Trucking property that identified the Parkway Lot as a potential source of the PERC. (Phase I entails a historical assessment of the site and review of past uses.) In 2004, the State sent notice to RSD Trucking asking it to investigate contamination in the area (Phase II).

Patricia Coppolino began work at ANR in 2004 and first became familiar with the Parkway Site in September of 2004. By 2005, she was the site manager for the Parkway Site. ANR defines a site as a place where there has been a release of hazardous material above a certain standard. A site encompasses the extent of a release irrespective of property boundaries.

Ms. Coppolino met with Mr. Daniels several times, including on the property in the fall of 2005, and asked him to conduct Phase II, which involves sampling and developing the

---

[2] Exhibit F shows the relationship between the Parkway Lot and houses in the neighborhood. Exhibit D identifies the owners of pertinent properties described in this Decision. Both purport to show features relating to groundwater flow, but the court is not addressing that issue and does not adopt those depictions as fact. The purpose of attaching these exhibits is simply to show the layout and relationships of the properties described.

feasibility of a Corrective Action Plan for cleanup. [3]  Mr. Daniels wanted to develop the Parkway Lot and enrolled in a program through the Two Rivers–Ottoquechee Regional Commission, which administered federal grant funds given to the State.  Two Rivers–Ottoquechee hired an environmental consultant to conduct Phase II, which led to the discovery of PERC in groundwater, soil, and soil gas underground, above the water table, on the Parkway Lot.  Until then, the focus had been on contamination in groundwater.  While PERC was detected in groundwater, it was at a depth not considered to cause concern for human health.

The June 2006 results showed high concentrations of PERC in soil vapor at a level in the soil (between 6 to 10 feet underground) that showed it had the potential to enter basements of nearby residences and affect indoor air quality.  This suggested a possible risk to human health and linked the PERC to the Parkway Lot for the first time.  It signaled the need for further investigation regarding possible effects on human health.  The State hired a consultant to do indoor air sampling to determine whether soil gas was getting into homes in the neighborhood.

The State sent a "first letter" to a representative of RSD trucking, which the State assumed was the owner of the Parkway Lot, calling upon it to undertake investigative and corrective action.[4]  The State also conducted a public informational meeting for neighbors.  A report received by the State showed levels of contamination in five homes in the neighborhood that exceeded Department of Health safety standards, and showed the need for emergency action in those homes and testing in other homes.

Mr. Daniels cooperated with the State in the summer of 2006.  In July he submitted an application to the State to participate in a "Redevelopment of Contaminated Properties Program."  In August he arranged for and paid for installing fans to temporarily divert the bad air away from the occupants.  However, by the fall of 2006, Mr. Daniels was no longer cooperating and did not work with ANR on further investigation.  He created Hazen Street Holdings, Inc. and transferred the Parkway Lot to it.  Since then, he has resisted liability.

An environmental consultant, KAS, was hired by the State to design and install "SSDs" (sub-slab depressurization systems) in eight houses in the neighborhood.  They do not eliminate the source of the contamination, but divert soil gas vapors to the outside.  They have been in place since then, and indoor air quality in the homes has improved.  Redesign and maintenance have been required.  Other than installation and maintenance of the SSDs and a little further sampling, no other activities have been pursued at the Parkway Site.  The extent of PERC contamination has not yet been determined.  The evidence shows that PERC from the Parkway Lot has migrated into soil, groundwater, soil gas, and indoor air on neighboring properties.  The source of the vaporization has not been removed.  Further investigation is needed to determine the full extent of the PERC contamination and its effect and to gather data on groundwater migration and the possible effect on the White River.

---

[3] ANR has apparently designated St. Johnsbury Trucking and Parkway as separate ANR sites, although they overlap.  The exact history of site designations by ANR is unclear.

[4] Apparently up to this point, both Ms. Coppolino and Mr. Daniels believed that the Parkway Lot was owned by the trucking business entity, but it was not.  It was Mr. Daniels personally who had bought it at the tax sale 11 years earlier.  This discovery of Mr. Daniels as owner apparently came as a surprise to both.

In this trial, the State seeks a judgment for approximately $283,000, plus interest from the dates of expenditures, based on three phases of action:

—from June to July of 2006, the State spent approximately $23,000 to conduct sampling;

—from September of 2006 to April of 2008, the State used approximately $20,000 of State funds and $200,000 in federal grant funds to install SSDs in eight houses and to redesign and improve the systems; and

—from July of 2008 to June of 2013, the State spent additional State funds to do additional indoor air and groundwater sampling and testing and to maintain the SSDs.

In the 2014 summary judgment decision, liability was imposed on Mr. Daniels but at that time the court did not issue judgment on the amount requested by the State, which was the same $283,000 as sought in this case, plus interest, for a total amount that was over $400,000 in 2014. The court determined that summary judgment procedure had not been properly followed with respect to amount of damages, and "given the high dollar amount at stake, the court will permit discovery on the issue of the amount of damages and then a hearing to permit Daniels to challenge the figures." 2014 Decision, page 11. Thus, the purpose of the hearing was for the State to prove the amount of money damages to be included in a judgment for "past damages, prejudgment interest, [and] the amount to be credited from the Fournier settlement." 2014 Decision, page 11.[5]

The State presented three witnesses at trial. Two of them verified that the expenditures had been made out of identified funds based on invoices that were approved by Patricia Coppolino with respect to State funds, and by a person authorized to do so on behalf of State Agency of Commerce and Community Development for the $200,000 in federal grant funds. There is no dispute that the money was spent on the basis of the invoices submitted into evidence. The key witness on the necessity and reasonableness of the expenditures was Patricia Coppolino, the ANR site manager. Defendant Daniels called no witnesses, but his attorney cross-examined extensively.

The necessity and reasonableness of expenditures by the State were highly contested.[6] Since the evidence of necessity and reasonableness came only from Patricia Coppolino, it is important to evaluate her background and experience and ability to provide expert testimony on evidence calling for an expert opinion.

She graduated from college in 1997 with a Bachelor of Science Degree in Environmental Chemistry. After college, she worked for 2 years for a company that provided technical assistance to EPA on-scene coordinators. Then for a little over 1½ years she worked for a

---

[5] The specific terms of "an injunction requiring Daniels to undertake such further 'investigation, removal and remedial action' as is reasonable and necessary" will also need to be determined. 2014 Decision, page 11. This will be addressed at the time of submission of the form of judgment resulting from the damages hearing.

[6] Mr. Daniels is responsible for "costs of investigation, removal, and remedial actions incurred by the State which are *necessary to protect the public health or the environment*." 10 V.S.A. § 6615(a) (emphasis added).

private environmental consultant in Vermont working on "site characterizations" and preparing site plans for the Department of Environmental Conservation (DEC). She began to work for DEC in 2004 in the Waste Management Division, working primarily in the Brownfields Response Program. She became a site manager in August. She provided oversight to Regional Planning Commissions related to Brownfield projects funded with EPA funds and reviewed "Phase I and II ESAs, CAFIs, and CAPs on Brownfield projects and . . . comments related to the report or redevelopment associated with the site." In 2012 she became an Environmental Program Manager.

As site manager beginning in 2004, she hired and directed consultants, reviewed and approved work plans, approved cost estimates and invoices, and ensured applicable standards were met. She has taken unspecified courses in vapor intrusion mitigation with content related to how a contaminant travels during intrusion and the best ways to sample vapor intrusion.

The evidence supports that she has knowledge and experience primarily in identifying and assessing conditions at a site and exercising responsibility for sampling. These processes are apparently known as "site characterization." She also has significant experience in administrative management of site projects. The technical work performed at the sites she has managed has been designed and done by hired contractors. The evidence does not support a finding that she is qualified to select and design and do cost analyses of mitigation or remediation systems on her own. Her approval of technical work to be done requires approval of a superior in the Waste Management Division whose identity and qualifications are unknown.

*2006 Expenditures*

The expenditures from June through November in 2006 were made to independent consultants largely for the purpose of indoor air sampling to determine whether soil gas was getting into homes such that the carcinogen PERC could be affecting human health. This is exactly the type of testing and sampling activity for which Ms. Coppolino had training and experience. Given the facts that PERC had been discovered in soil gas, that it was a known carcinogen, that a source of PERC in air can be vaporization of contaminated soil gas, and that homes in the neighborhood had air quality that was unsafe according to Department of Health standards, the court accepts her expert determination that there was a basis for conducting sampling in other homes in the area to investigate whether there was a risk to human health in other homes in the neighborhood.

Defendant argues that she is not qualified as a toxicologist and did not have the expertise to make such a judgment, but the court has determined that she is an expert in site evaluation. Experts often rely on the work and standards of other experts in evaluating situations within their own expertise, and she testified that ANR relies on the air quality standards developed by the Department of Health rather than duplicating or challenging that work within its own agency. The court finds this credible and reasonable for the purpose for which she used the information, which was within her realm of expertise.

The expenditures for sampling in this phase consist of the following:

| | | |
|---|---|---|
| 6/06 | Indoor air sampling (Exhibit 6) | 9,319 |
| 7/06 | Indoor air sampling and report (Exhibits 7, 8) | 13,737 |
| | | $23,046 |

6

Based on Ms. Coppolino's expertise in site characterization and sampling of soil gas vapors and their effect on indoor air quality, the court finds that, based on her opinion, these costs were necessarily incurred in order to investigate identified risks to human health, and that the amounts are reasonable.

*2006–2008*

During this period, the State spent $19,088 of State funds (Exhibit 40) and $200,000 in federal funds made available to the State and administered through the Agency of Commerce and Community Development (Exhibits 39, 41–49) to install sub-slab depressurization systems (SSDs) in eight homes with contaminated indoor air.

Ms. Coppolino's testimony was that she directed an environmental consultant to design and install SSDs in these homes, but the evidence is not entirely clear about who had authority to decide upon and order this action and there is no evidence about the professional qualifications of anyone else involved. Exhibits 10 et seq. state that the work plan for SSDs was approved by a George Desch of the State of Vermont-DEC, but there was no evidence about who he was or what his role was, although Ms. Coppolino acknowledges that her decision was approved by the Director (unnamed) in the Department of Waste Management. In any event, the decision was made to install SSDs rather than to pursue some other remedy, and Ms. Coppolino takes responsibility for that decision and for reviewing and approving work plans and cost estimates.

The evidence supports the fact that the results of site investigation showed that some type of action was needed to reduce the risk that occupants of affected homes would be breathing indoor air with excessive levels of PERC concentration. As to how and why this solution was selected, Ms. Coppolino's direct testimony was simply that the "sub-slab depressurization systems are installed in order to mitigate [] risk to indoor air." On cross-examination, she acknowledged that SSDs do not remove the source of contamination, and that there are other possible responses to the discovery of soil gas vaporization, such as capping to prevent contamination of groundwater, removal of contaminated soil, and vapor extraction. She also testified that no feasibility investigation was done to determine how best to spend money to get the best cleanup outcome overall. Apparently, she perceived that the need was to take steps right away to improve the indoor air quality in the homes in the neighborhood. While the evidence supports that there was such a need, it does not establish the necessity for the selection of SSDs as the immediate action.

The decision to install SSD systems in eight homes was a major decision that called for technical expertise and the evaluation of this and perhaps other options in relation to short and long-term benefits and costs. There is no evidence that the State engaged in a process involving expert knowledge and judgment to determine the best method for solving the problem presented by PERC concentrations in contaminated air from the soil gas vaporization. Ms. Coppolino's testimony was that installation of SSDs was common. It was an immediate measure to improve air quality for the home occupants in the short run but it was not a long-term abatement solution to the source of the problem, which still needs resolution.

One would expect that alternative plans and proposals would be solicited from environmental engineers, and then cost estimates obtained for each alternative, with an identification of its specific goal, such as whether it was a short or long-term solution, or that an environmental engineer within the Department would have the expertise to make such a decision

about necessity and cost effectiveness. There is no evidence that the State engaged in a deliberative process to determine what action would be most effective to address the immediate need to mitigate the risk to human health at the most reasonable cost. It may well be that a professional engineer with expertise in responding to a situation of indoor air contaminated by vaporized soil gas would be able to give an opinion that this was necessary action, but the evidence did not include such an opinion by a qualified expert.

Ms. Coppolino acknowledged that the source of the contaminated air has not been removed. Her testimony about why SSDs were installed was the conclusory statement that the method is "the most common and cost effective." She stated the conclusion that the costs of the SSDs were "necessary" (presumably to remove the contaminant PERC from the air breathed by occupants of the homes in which they were installed), but she did not provide facts in support of this statement. For example, she did not explain what alternatives existed for the purpose, or the comparative benefits or costs of SSDs as opposed to alternatives. The fact that no feasibility study was done makes it even more important that the immediate action taken of designing and installing SSDs be supported by expert testimony.

If a patient with a broken leg presents to an orthopedic doctor, one would expect the doctor to engage in a process of analysis to determine what course of treatment was necessary to repair the leg to the maximum extent possible (cast, traction, surgery, etc.). The doctor may need to consult with others with specialized knowledge, such as an orthopedic surgeon, and to be able to explain the basis for both short and long-term actions undertaken. If most broken legs heal with casts, which is also the least expensive, that alone is not a reason to choose a cast, although it may well be that a cast represents a reasonable short-term immediate response under particular circumstances even if other treatment is going to be pursued. If a commercial building is seriously damaged by fire, a decision has to be made as to whether it makes sense to repair it or demolish and rebuild a new building, and there may be short-term measures that are necessary to protect the public from the damaged building no matter which course is pursued, but such a decision calls for professional judgment as to alternative plans and the necessary costs associated.

There is no evidence to show that Ms. Coppolino's background and experience, either in 2006–2008 or now, were or are that of an environmental engineer with the professional capacity to make an analysis on her own of the type described above. Her testimony that the costs of the SSD system were "necessary" was conclusory and did not include a backup explanation of how and why this system, at this cost, was necessary to achieve what outcome, and necessary and reasonable as compared to alternatives. While she apparently received approval from her supervisor for the decision, as acknowledged in the State's proposed findings of fact, there is no evidence about the identity or qualifications of that person and thus the court is unable to evaluate the reliability of the decision. The normal method for proving the necessity and reasonableness of the work of professionals is to call as a witness a disinterested qualified professional in the field to testify as to the independent choices available and the necessity and reasonableness of the work done. There was no such testimony in this case, nor was there evidence from the engineering contractor hired to do the work that it was an appropriate and necessary response to the situation.

The State's evidence on the cost of the SSD system is no more sufficient on this point than it was at the time of the summary judgment motion. It is essentially the same: Ms.

Coppolino's own conclusory statement that the work and its cost was necessary. In her testimony she affirmed, without elaboration, the decision that she herself made several years ago. One reason that the court in 2014 determined that a damages hearing should be held was the fact that there was a "high dollar amount at stake." This expenditure for the SSD system represents most of that amount, yet the evidence on necessity and reasonableness is virtually the same and has not been supported by reliable expert testimony.

Under 10 V.S.A. § 6615, the obligation of an owner is primarily performance of the necessary work himself or herself, and if the owner does not do it, then the government can do the work and recover in a civil action a judgment for damages for the expenses that the owner would have incurred if he had done it himself. Such expenses must be necessary to remediate the risk to human health or the environment and reasonable in amount. An owner is not likely to simply hire a company to install a particular system without exploring alternative solutions to the problem and analyzing which one is likely to be most effective in relation to short and long-term goals.

The court cannot find that the State has met its burden of proof as to the necessity of the SSD installation or the reasonableness of its cost to the State.[7] Therefore, the State is not entitled to recovery of the $220,000 (approximately) spent to install the SSD systems. As a result of this finding, it is not necessary to address Mr. Daniels' argument that $200,000 of the money spent was not actually State money and therefore not subject to reimbursement.

*2008–2013*

From September of 2008 to 2013, the State made further expenditures for maintenance of the SSDs and for additional indoor air sampling and for a survey of monitoring wells to determine the direction of groundwater flow. For the reasons stated above, the expenditures related to SSDs have not been proved. Based on Ms. Coppolino's expertise in site characterization and sampling, the court finds that, based on her opinion, the following costs were necessarily incurred in order to investigate identified risks to human health, and the amounts are reasonable.

| 8/08–5/09 | Site assessment | Exhibits 12–18 | 990 |
| | | | 2,467 |
| | | | 417 |
| | | | 1,573 |
| | | | 19,064 |
| | | | 652 |
| | | | 508 |

---

[7] The evidence showed that even after installation of the SSDs, there were "exceedences" of air quality standards that called for redesign, and that in some houses the SSDs were not fully effective and additional work had to be done, such as pouring concrete. The cost of such work is included in the overall $200,000. The fact that redesign and remedial work in the houses had to be done underscores the necessity of expert evidence to support the necessity and reasonableness of both the original choice for SSDs and all the work done on the SSDs. To be clear, the court makes no finding that the SSD work was *not* necessary and is only finding that necessity is not proven by a preponderance of the evidence.

| | | | |
|---|---|---|---|
| 8/09–11/09 | Indoor air sampling | Exhibit 19–23 | 1,264 |
| | | | 1,368 |
| | | | 833 |
| | | | 5,263 |
| | | | 644 |
| | | | |
| 12/09 | Groundwater survey | Exhibit 24 | 2680 |
| 3/10 | Groundwater survey | Exhibit 27 | 81 |
| | Total | | $37,804 |

## Conclusions of Law

*Past Damages*

As previously determined, Mr. Daniels, as owner of the Parkway Lot, was responsible, starting in June of 2006, for the "costs of investigation, removal, and remedial actions incurred by the State which are necessary to protect the public health or the environment." 10 V.S.A. § 6615(a). His primary obligation as a matter of law was to assume responsibility for the work. Although he initially paid for some temporary emergency measures, he stopped paying and the State then incurred expenses to investigate and mitigate the threat to human health caused by the vaporization of soil gas containing PERC and its intrusion into neighboring homes.

The State is entitled to a civil judgment representing "reimbursement from any person who caused governmental expenditures for the investigation, abatement, mitigation, or removal of a hazard to human health or the environment." 10 V.S.A. § 8221(b)(5). Thus, the State is entitled to reimbursement for past expenditures for investigation and remedial action necessary to protect the air quality in the Parkway Lot neighborhood and to protect local residents from carcinogens in the air in their homes, to the extent that those expenditures were necessary and the amounts were reasonable.

Since the statute provides for a civil judgment, the normal jurisprudence related to civil liability applies, and the State bears the burden of proof by a preponderance of the evidence.[8] The court has found Ms. Coppolino to be an expert in site evaluation, sampling, and project administration and finds her evidence credible with respect to opinions on those topics, but not an expert in selection or design of technical remediation solutions. The burden of proof is not met with respect to the SSD systems. The court is mindful of the fact that there was an improvement in the quality of indoor air in the homes after the installation of the SSDs, and the success of that action is fortunate for the residents. That does not, however, equate to a conclusion that designing and installing SSDs for those eight homes was necessary or that the overall expense of doing so was the necessary and reasonable course of action under the circumstances.

---

[8] The State argues that "cost recovery" under 10 V.S.A. § 6615 is "not traditional damages." (Transcript, Day 4, p. 73, lines 4–5) Nothing in the statute justifies such a distinction. The statute simply refers to "an action in the Civil Division," in which the burden of proof is by a preponderance of the evidence unless otherwise specified.

10

Moreover, even if Ms. Coppolino were to have been qualified as an expert on selection of remedial methodology, the court is not bound to accept expert testimony, even if unrefuted by another expert, without its own determination that the opinion has been sufficiently supported and is reliable. See *State v. Nugent*, 2014 VT 4, ¶¶ 8–10, 195 Vt. 411. In this case, there is insufficient evidentiary support for the necessity and reasonableness of the SSDs.

The State argues that the court should defer to the Agency and cites cases calling for substantial deference to an agency's interpretations of its own regulations and rules. The choice to install SSDs, as opposed to taking some other action, did not involve interpretation of its own rules. The evidence also did not show that the agency exercised its expertise to choose one reasonable and necessary option among competing but different reasonable and necessary options. If the agency has engineers with the expertise to make decisions about immediate actions to take, it should be a simple matter for the State to provide that testimony to support the necessity and reasonableness of the use of State funds (and thereby instill public trust and confidence).

Given that it is possible that the decision and design related to SSDs might have been able to be supported with reliable expert opinion testimony, this result may appear to be somewhat harsh on the State. The evidence is clear, however, that this is only the beginning of a significant liability to be borne by Mr. Daniels (with possible contributions from Paul Gendron[9]). The attorney for the State indicated in his Opening Statement that the overall cost of cleanup could wind up being as much as $2 million—in any event, a significant sum extending into the future. Mr. Daniels will be responsible for either doing and paying for the work himself, or reimbursing the State for its expenses, including interest. See *State v. Irving Oil Corp.*, 2008 VT 42, ¶ 15, 183 Vt. 386 (describing the "prayer for reimbursement of response costs" as incidental to the declaratory and injunctive relief certifying liability and compelling the defendant to "assume responsibility").

If Mr. Daniels believes that he can do the work at less cost than the State, he has the opportunity to do so and in fact, performance is his primary obligation. If he does not do it and the State undertakes the work, it is important that the State is able to show, by meeting its burden of proof, that the decisions it makes to spend money are for work that is necessary and that the amounts are reasonable. Moreover, as to the $220,000, it is noted that the Fourniers have already contributed $100,000. In addition, Mr. Gendron did not challenge the $283,000 figure and the State intends to pursue him for collection, in which case it may recover more of that cost.

Based on the evidence, the State has met the burden of proof on the expenditures made on the dates identified above in the total amount of $60,850 ($23,046 + $37,804 = $60,850).

Mr. Daniels argues that the State has not proved that *any* damages for which it seeks compensation were necessary. His reasoning is that because the State had knowledge of possible contamination at the site long before Mr. Daniels purchased the Parkway Lot and the State did nothing, it permitted migration of the contamination and subsequent vaporization into neighboring properties, and therefore the harm for which the State seeks to hold him responsible was determined by the State not to be necessary and should not be chargeable to him. However,

---

[9] The State indicated in Opening Statement that it intended to pursue collection action against Mr. Gendron on its default judgment for $283,000 plus interest, as well as for future work.

under 10 V.S.A. § 6615(a), an owner of a property has full liability during the period of ownership. *State v. Howe Cleaners, Inc.*, No 27-1-04 Wncv, 2006 WL 6047594 (Vt. Super. Ct. Mar. 10, 2006), *aff'd on other grounds*, 2010 VT 70, 188 Vt. 303. Mr. Daniels became the owner in 1995. The State first had information that contamination from the Parkway Lot represented a risk to human health in 2006. He had full responsibility for investigation and remediation of whatever existed at that time, and he has had full responsibility since then throughout his period of ownership.

*Prejudgment Interest*

Because Mr. Daniels was responsible for paying the proven costs in the first instance and knew of his obligation, and because the amount of each expenditure was known at the time of each payment by the State, he is responsible for prejudgment interest on each of the proven expenditures. See *Remes v. Nordic Grp., Inc.*, 169 Vt. 37, 39 (1999) (prejudgment interest "is awarded as of right where it is 'liquidated or capable of ready ascertainment'") (citation omitted)).

*Credit for Fournier settlement funds*

An issue identified in the 2014 Decision as an item for determination at this trial is the amount to be credited from the Fournier settlement toward the obligation of Mr. Daniels. The State's evidence was that the $100,000 received from the Fourniers from the settlement in March of 2014 has been set aside in a special fund and was used in 2016 for maintenance of the SSD systems. The State seeks a judgment that includes full prejudgment interest to date on each expenditure to which it is entitled, without credit for the funds from the Fournier settlement. That is tantamount to treating Mr. Daniels as if no compensation had been received to compensate the State for its expenses at the site.[10]

While it is reasonable for the State to segregate the Fournier funds and use them for a specific purpose from an accounting or resource management point of view, that is a matter of how recovered funds are *used*, and does not affect liability. It does not mean that the State is entitled to collect interest from Mr. Daniels as if that money had not been received by the State. The obligations of Mr. Daniels, the Fourniers, and the Gendron Defendants are joint and several to the extent they overlap. Mr. Daniels has full liability, but he is entitled to a credit against his obligation for amounts paid toward that obligation by others based on their own share of liability. Thus, Mr. Daniels is entitled to have the $100,000 paid by the Fourniers in March of 2014 credited against the total amount he owed at that time. The total amount he owed included prejudgment interest that had accrued as of that date.

The State argues that it is not seeking reimbursement for expenditures that were made in 2016 from this special fund, resulting in a reduction of his liability from what it would otherwise be, and thus Mr. Daniels cannot complain about being responsible for prejudgment interest.

---

[10] In a post-trial memo, the State acknowledged it would recalculate prejudgment interest if the court determined that Mr. Daniels should be credited with receipt of the Fournier funds as of March of 2014.

However, there is no evidence allowing the court to find that the benefit to Mr. Daniels of not being charged for the 2016 expenditures is equal to or greater than the benefit of a $100,000 credit in March of 2014 against his then-existing obligation as calculated on the basis of these findings. It was the State's choice not to seek compensation from Mr. Daniels for the 2016 expenditures, and the State's choice to not offer evidence of the value of those expenditures compared to prejudgment interest. The State is not entitled to make a unilateral decision to decline to credit Mr. Daniels with the Fournier settlement funds at the time it received them.

The State shall submit its calculation for prejudgment interest on the amounts included in this decision, showing interest from each date of expenditure as identified above to March 2014. Once the total due as of March 2014 has been determined, Defendants are entitled to a credit of $100,000 against that amount. They are also responsible for remaining prejudgment interest to the present. Defendants shall have 14 days to file any objection to the State's calculation of interest and credit.

*Injunctive Relief*

The evidence is clear that the contamination problems at the Parkway site, including their effect on the environment and human health, have not been fully remediated. Only temporary measures remain in place. In addition, more investigation is needed. Mr. Daniels has not assumed his legal responsibility under 10 V.S.A. § 6615, and shows no signs of doing so. The State is entitled, pursuant to 10 V.S.A. § 8221(b)(2), to an order requiring Mr. Daniels to undertake "remedial actions . . . to mitigate hazard to human health or the environment." Mr. Daniels raises objections to an injunction in reliance on common law jurisprudence relating to the use of injunctions for relief. Such arguments are superseded by the statute itself, which clearly provides for the court to issue an order requiring performance. Whether that order is called an injunction or otherwise is immaterial; it is authorized by statute.

The State has previously submitted a proposed order, prior to the appearance of Mr. Daniels's present attorney in the case. The State shall submit a new proposed order, and Mr. Daniel's attorney shall have 14 days to file any objection.

**Order**

The State shall submit within 14 days a proposed form of judgment for damages together with a worksheet showing its calculation of prejudgment interest as well as a proposed order for prospective relief pursuant to 10 V.S.A. § 8221(b)(2), and Mr. Daniel's attorney shall have 14 days to file any objection.

Dated at Montpelier, Vermont this 19th day of January 2018.

_____
Mary Miles Teachout
Superior Court Judge

13